IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

TERRY CICIO,

                          Plaintiff,

                                                    Civ. Action No.
          vs.                                       9:08-CV-534 (NAM/DEP)

GRAHAM; PETER M. SIGONA;
RICHARD D. RUSTON, III; PHIL J.
MANNA; A. VEGA; and RYERSON,

                          Defendants.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

TERRY CICIO, *Pro Se*
01-R-5455
Upstate Correctional Facility
P.O. Box 2001
Malone, NY  12953

FOR DEFENDANTS:

HON. ANDREW M. CUOMO                  ADRIENNE J. KERWIN, ESQ.
Office of the Attorney General
State of New York
Department of Law
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Terry Cicio, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights.  In his complaint plaintiff asserts that he was assaulted by one of the defendants while two others stood by and failed to intervene, and that following the assault medical personnel at the prison facility where the incident took place failed to provide requested medical treatment for his resulting injuries.  Plaintiff's complaint seeks both declaratory and monetary relief.

Currently pending before the court are cross-motions for summary judgment.  Plaintiff initiated the motion process, moving for summary judgment and claiming that the evidence in the record supports a finding in his favor on the issue of liability and that no reasonable factfinder could conclude otherwise.  Defendants have responded by both opposing plaintiff's motion and seeking summary judgment dismissing plaintiff's complaint.  In their motion defendants assert that based upon the record now before the court no reasonable factfinder could find in plaintiff's favor on any of his claims and that, in any event, they are deserving of qualified immunity from suit under the circumstances presented.

2

Having carefully reviewed the record considered in light of the arguments of the parties, for the reasons that follow I recommend that defendants' motion be granted and that plaintiff's motion be denied.

I.      BACKGROUND

The facts forming the basis for plaintiff's claims are not particularly complex, although the parties have given conflicting accounts of the relevant events, particularly with regard to the circumstances surrounding the use of force by prison officials of force against Cicio.

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his complaint, Cicio was housed at the Auburn Correctional Facility ("Auburn"), located in Auburn, New York.  *See generally* Complaint (Dkt. No. 1).  On March 7, 2006, while plaintiff was among a group of between sixteen and eighteen inmates confined in the Auburn hospital depot awaiting transfer out a disruption occurred involving a fellow prisoner.  Complaint (Dkt. No. 1) Statement of Facts ¶ 1; Sigona Decl. (Dkt. No. 38-8) ¶ 3; Manna Decl. (Dkt. No. 38-9) ¶ 3; *see also* Kerwin Aff. (Dkt. No. 38-3) Exh. K (transcript of plaintiff's deposition, conducted on May 15, 2009 and hereinafter cited as "Plaintiff's Dep. Tr." at pp. 8-10).

3

Defendants Sigona, Manna and Ruston, all three of whom are employed as corrections workers at the facility, responded to the incident, entering the cell and ordering all of the inmates to retreat to the back.  Complaint (Dkt. No. 1) Statement of Facts ¶ 2, Manna Decl. (Dkt. No. 38-9) ¶ 3; Sigona Decl. (Dkt. No. 38-8) ¶ 3.  While those corrections officers attempted to remove the dissident inmate from the cell plaintiff Cicio became involved.  It is at this point that the parties' versions of the relevant events significantly diverge.

Plaintiff contends that during the ensuing events he was pushed into defendant Manna, who then grabbed him by the hair and began to pull him toward the cell door, resulting in Cicio being thrown to the floor and kneed in the nose.  Complaint (Dkt. No. 1) Statement of Facts ¶ 4; Cicio Decl. (Dkt. No. 40-2) ¶ 4.  Plaintiff maintains that after regaining his footing he was again grabbed by the hair and pushed face first into the wall.  Complaint (Dkt. No. 1) Statement of Facts ¶ 5.  Plaintiff asserts that while this was occurring defendants Sigona and Ruston stood by and watched without coming to his assistance.  *Id.*

Defendants offer a markedly different version of the relevant events.  According to the defendants, while they were attempting to extricate the

4

disruptive inmate from the holding cell Manna issued a direct order to the

plaintiff to move to the back of the cage.  Plaintiff's Exh. D (Dkt. No. 35-2)

Disregarding the order, plaintiff blocked Corrections Officer Manna's path,

lunged at him and struck him with a closed fist knocking him to the floor.

*Id.*; *see also*, Manna Decl. (Dkt. No. 38-9) ¶ 4; Sigona Decl. (Dkt. No. 38-8)

¶ 5.  Cicio then began yelling to the other inmates in the cage, encouraging

them to join in, exclaiming, "let's get them."  Plaintiff's Exh. D (Dkt. No. 35-

2).   At that point, defendants Manna and Sigona attempted to subdue

Cicio, who continued to struggle and resist, resulting in Cicio and Officer

Manna falling to the floor.  Manna Decl. (Dkt. No. 38-9) ¶¶ 4-5; Sigona

Decl. (Dkt. No. 38-8) ¶ 5.

As a result of the incident a misbehavior report was subsequently

issued by Corrections Officer Manna charging Cicio with disciplinary

infractions, including 1) assault on staff; 2) prison takeover; 3) engaging in

violent conduct; 4) inciting inmates; 5) disobeying a direct order; 6)

physically interfering with an employee; and 7)  impeding inmate

movement.  Mann Decl. (Dkt. No. 38-9) ¶ 7.  Following a Tier III disciplinary

hearing commenced on March 13, 2006, plaintiff was found guilty of five of

the six violations including, *inter alia*, assault on staff.  Kerwin Aff. (Dkt. No.

38-3) Exh. I.  As a result of that determination plaintiff received a series of

sanctions which, after being modified on appeal, included twelve months of

confinement in a facility special housing unit ("SHU") with a corresponding

loss of packages, commissary, and telephone privileges, and an additional

recommendation that plaintiff forfeit twelve months of good time credits.  *Id.*

Following the incident plaintiff was immediately removed from the

area and taken to be examined by facility medical personnel.  Manna Decl.

(Dkt. No. 38-9) ¶ 6.  Plaintiff was examined by defendant A. Vega, a

registered nurse, within fifteen to twenty minutes after the incident.  Cicio

Decl. (Dkt. No. 40-2) ¶ 5; Plaintiff's Dep. Tr. at p. 22.  During that

examination Nurse Vega observed a reddened area on the bridge of

plaintiff's nose and noted his reports of minor pain in the nose and head

areas.  Plaintiff's Dep. Tr. at pp. 25-26; *see also* Kerwin Aff. (Dkt. No. 38-3)

Exhs. B and H.  Plaintiff was not treated for his injuries nor was he

scheduled to see a doctor.  Complaint (Dkt. No. 1) Statement of Facts ¶ 8.

Plaintiff claims that following the incident he submitted sick call slips

on March 8, 9, 13 and 19, 2006, requesting medical intervention to address

his injuries.  Complaint (Dkt. No. 1) Statement of Facts ¶¶ 9, 11-12 and 15.

Plaintiff contends, however, that those sick call slips were not processed

6

by defendant Ryerson, the nurse administrator at Auburn.  *Id.*  ¶ 22.

Defendant Ryerson denies that allegation and counters that based upon

her review of all sick call slips received during the time period involved,

there is no record of plaintiff having requested sick call at any time

between March 8 and March 20, 2006.  Ryerson Decl. (Dkt. No. 38-10) ¶ 4.

As is the case with regard to plaintiff's substantive allegations, the

parties disagree over the procedural steps taken by the plaintiff to seek

internal review of the relevant events.  Plaintiff contends that following the

incident he filed two separate grievances, filing the first on March 14, 2006,

and both related to the failure of prison officials to permit him to attend sick

call.  Complaint (Dkt. No. 1) Statement of Facts ¶¶ 14, 16.  Plaintiff does

not assert in his complaint that he filed a grievance regarding the alleged

use of force and failure of prison officials to intervene on his behalf,

although in an affirmation in opposition to defendants' summary judgment

motion Cicio succinctly states "[p]laintiff filed grievances on both incidents,

only one was responded to."  *See* Cicio Aff. (Dkt. No. 39) ¶ 3.  Plaintiff's

motion submission also includes a handwritten memorandum, dated March

14, 2006 and addressed to the facility inmate grievance review committee

("IGRC"), citing the events including the alleged assault by prison officials.

*See* Plaintiff's Exhs. (Dkt. No. 35-3) p. 24 of 27.

According to the defendants, the sole grievance filed by plaintiff regarding the incident was submitted on March 24, 2006 and was denied by the facility IGRC on April 3, 2006 after plaintiff was transferred out of Auburn.  Graham Decl. (Dkt. No. 38-7) ¶ 6.  That denial was subsequently affirmed by defendant Graham, the Superintendent at Auburn, on April 3, 2006.   While plaintiff claims to have appealed that determination on June 12, 2006, presumably to the DOCS Central Office Review Committee ("CORC"), the record contains no further indication of whether that appeal was in fact taken, and if so, the result.  *See* Complaint (Dkt. No. 1) Statement of Facts ¶ 18.  According to prison officials at Auburn, their research of relevant records at the facility failed to disclose additional documents regarding plaintiff's exhaustion of remedies and, significantly, to show that plaintiff appealed to Superintendent Graham from the disposition of his claimed use of force grievance.  *See* Graham Decl. (Dkt. No. 38-7) ¶ 4.

II.   <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on April 28, 2008.[1]  As defendants,

---

[1]   This action was filed in the Western District of New York but was subsequently transferred here by order issued on May 2, 2008 by Chief District

plaintiff's complaint names Auburn Superintendent Harold D. Graham;

Corrections Sergeant Peter M. Sigona; Corrections Officers Richard D.

Ruston and Phil J. Manna; Registered Nurse A. Vega; and Nurse

Administrator Ryerson.  The complaint alleges varying claims against those

defendants including for the alleged use of excessive force and failure to

protect the plaintiff from the use of force as well as indifference to his

medical needs arising from the incident.[2]  *See generally* Complaint (Dkt.

No. 1).

     Issue was initially joined in the action by defendant Manna through

his filing of an answer on September 25, 2008.  Dkt. No. 23.  Following the

denial of their pre-answer motion seeking dismissal of plaintiff's claims

against them on a variety of bases, *see* Dkt. Nos. 29, 32, an answer was

filed on behalf of the remaining defendants on February 25, 2009.  Dkt. No.

30.

---

Judge Richard J. Arcara.  Dkt. Nos. 1, 3.

    [2]   In his motion submission, plaintiff also claims to have asserted a cause of action for violation of procedural due process, based upon the defendants' alleged failure to process and investigate his grievances.  Plaintiff's Memorandum (Dkt. No. 35-3) at p. 2.  Such a claim, if indeed present in this action, is nonetheless subject to dismissal, since it is well established that a prison inmate has no cognizable constitutional right of access to the grievance process or to have grievances which have been filed investigated.  *Avent v. Doe*, No. 9:05-CV-1311, 2008 WL 877176, at *8 (N.D.N.Y. Mar. 31, 2008) ( Scullin, S. J. & DiBianco, M. J.) (citing *Torres v. Mazzuca*, 246 F. Supp.2d 334, 342 (S.D.N.Y. 2003)).

On July 15, 2009, following pretrial discovery, plaintiff filed a motion for summary judgment in his favor.  Dkt. No. 35.  While plaintiff's motion appears to focus on the defendants' use of force, it purports to seek summary judgment on all of his claims.  *See id.*  On September 28, 2009, defendants responded in opposition to plaintiff's motion and in support of a cross-motion requesting judgment dismissing all of plaintiff's claims against them as a matter of law.  Dkt. No. 38.  In their motion, defendants argue that 1) plaintiff's deliberate medical indifference claim is legally deficient based both upon his inability to establish the existence of a serious medical need and the lack of evidence of indifference on the part of defendants Vega or Ryerson, the two medical personnel against whom the claim appears to have been lodged ; 2) plaintiff's claim surrounding the alleged use of a excessive force and failure to intervene lacks merit; 3) plaintiff's claims against Superintendent Graham are subject to dismissal based upon his lack of personal involvement in the constitutional deprivations alleged; and 4) in any event defendants are entitled to qualified immunity from suit.  Plaintiff has since responded in opposition to defendants' motion and in further support of his initial summary judgment motion.  Dkt. Nos. 38, 39, 40.

10

The parties' cross-motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most

favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v.*

*Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary

judgment is warranted only in the event of a finding that no reasonable trier

of fact could rule in favor of the non-moving party.  *See Building Trades*

*Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002)

(citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511

(summary judgment is appropriate only when "there can be but one

reasonable conclusion as to the verdict").

     In a case such as this, where parties have interposed cross-motions

for summary judgment, each motion must be independently assessed,

using this standard as a backdrop.  *See Light Sources, Inc. v. Cosmedico*

*Light, Inc.,* 360 F. Supp.2d 432, 434 (D. Conn. 2005).

     B.     Excessive Force/ Failure To Intervene

     At the heart of plaintiff's complaint is his claim that on March 7, 2006

he was subjected to an unprovoked attack by defendant Manna and that

defendants Sigona and Ruston watched and failed to take any measures

to end the assault and that, as a result, he suffered physical injuries.

Plaintiff claims that the record supports his excessive force and failure to

intervene claims as a matter of law.  Defendants counter by arguing that no

reasonable factfinder could conclude, based upon the record now before

the court, that plaintiff's constitutional rights were violated, even assuming

the truth of his version of the relevant events.

      1.   <u>Excessive Force</u>

Plaintiff's excessive force claim must be analyzed under the Eighth

Amendment, which proscribes punishments that involve the "unnecessary

and wanton infliction of pain" and are incompatible with "the evolving

standards of decency that mark the progress of a maturing society."

*Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976);

*see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084

(1986) (citing, *inter alia, Estelle*).  While the Eighth Amendment does not

mandate comfortable prisons, neither does it tolerate inhumane treatment

of those in confinement; thus, the conditions of an inmate's confinement

are subject to Eighth Amendment scrutiny.  *Farmer v. Brennan,* 511 U.S.

825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452

U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment

is violated by an "unnecessary and wanton infliction of pain."  *Whitley,* 475

U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v.*

*Crippen,* 193 F.3d 89, 91 (2d Cir. 1999).  The lynchpin inquiry in deciding

claims of excessive force against prison officials is "whether force was

applied in a good-faith effort to maintain or restore discipline or maliciously

and sadistically for the very purpose of causing harm."  *Hudson v.*

*McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998-999 (1992) (applying

*Whitley* to all excessive force claims); *Whitley*, 475 U.S. at 320-21, 106

S.Ct. at 1085 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.)

(Friendly, J.), *cert. denied sub nom.*, *John v. Johnson*, 414 U.S. 1033, 94

S.Ct. 462 (1973)).

Analysis of claims of cruel and unusual punishment requires both

objective examination of the conduct's effect and a subjective inquiry into

the defendant's motive for his or her conduct.  *Wright v. Goord*, 554 F.3d

255, 268 (2d Cir. 2009) (citing *Hudson,* 503 U.S. at 7-8, 112 S.Ct. at 999

and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).  As was

recently emphasized by the United States Supreme Court in *Wilkins v.*

*Gaddy*, however, after *Hudson* the "core judicial inquiry" is focused not

upon the extent of the injury sustained, but instead whether the nature of

the force applied was nontrivial.  __ S. Ct. __, 2010 WL 596513, at *3 (Feb.

22, 2010) (per curiam).  Accordingly, when considering the subjective

element of the governing Eighth Amendment test a court must be mindful

that the absence of serious injury, though relevant, does not necessarily

negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically
> use force to cause harm, contemporary standards
> of decency always are violated . . . . This is true
> whether or not significant injury is evident.
> Otherwise, the Eighth Amendment would permit any
> physical punishment, no matter how diabolic or
> inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson*, 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v.*

*O'Keefe*, 899 F. Supp. 972, 973 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting

*Hudson*, 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140

F. Supp.2d 204, 211 (N.D.N.Y. 2001) (Kahn, J.).  Even a *de minimis* use of

physical force can constitute cruel and unusual punishment if it is

"repugnant to the conscience of mankind."  *Hudson*, 503 U.S. at 9-10, 112

S.Ct. 1000 (citations omitted).

    With its focus on the harm done, the objective prong of the inquiry is

contextual and relies upon "contemporary standards of decency."  *Wright*,

554 F.3d at 268 (quoting  *Hudson*, 503 U.S. at 8, 112 S. Ct. at 1000)

(internal quotations omitted)).  When addressing this component of an

excessive force claim under the Eighth Amendment calculus, the court can

16

consider the extent of the injury suffered by the inmate plaintiff.  While the

absence of significant injury is certainly relevant, it is not dispositive.

*Hudson*, 503 U.S. at 7, 112 S.Ct. at 999.  The extent of an inmate's injury

is but one of the factors to be considered in determining a prison official's

use of force was "unnecessary and wanton"; courts should also consider

the need for force, whether the force was proportionate to the need, the

threat reasonably perceived by the officials, and what, if anything, the

officials did to limit their use of force.  *Whitley*, 475 U.S. at 321, 106 S.Ct.

at 1085 (citing *Johnson*, 481 F.2d at 1033).  "But when prison officials use

force to cause harm maliciously and sadistically, 'contemporary standards

of decency are always violated . . . .  This is true whether or not significant

injury is evident.'"  *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S.

at 9, 112 S Ct. at 1000).  That is not to say, however, that "every

malevolent touch by a prison guard gives rise to a federal cause of action."

*Griffen*, 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d

Cir. 1993)); *see also Johnson*, 481 F.2d at 1033 ("Not every push or shove,

even if it later may seem unnecessary in the peace of a judge's chambers,

violates a prisoner's constitutional rights").

    Addressing the objective prong of the Eighth Amendment analysis,

the fact that Cicio suffered minor though discernable injuries from the use
of force distinguishes this case from others in which the lack of injury has
justified summary judgment dismissing excessive force claims under the
Eighth Amendment.  *See, e.g., Boddie v. Schnieder,* 105 F.3d 857, 862 (2d
Cir. 1997) (the fact that the plaintiff, who claims he was "bumped, grabbed,
elbowed, and pushed" by the defendants did not rise to a level of
constitutional significance since plaintiff did "not maintain that he
experienced any pain or injury as a result of the physical contact");
*Cunningham v. Rodriguez*, No. 01 Civ. 1123, 2002 WL 31654960, at *5
(S.D.N.Y. Nov. 22, 2002).[3]  Under the circumstances now presented it
would be inappropriate to find, as a matter of law, that objectively plaintiff's
injuries were not sufficiently serious to rise to a constitutionally cognizable
level.

Turning to the subjective element, the record is devoid of any
evidence from which a reasonable factfinder could conclude that this
element of plaintiff's excessive force claim against Manna has been met.
Rather than representing an unprovoked use of force, by plaintiff's own
version, the use of force against the plaintiff occurred during a period of

---

[3]   Copies of all unreported decisions cited in this document have been
appended for the convenience of the *pro se* plaintiff.

turmoil when one or more disruptive inmates in a group of between sixteen and eighteen combined in a single holding cell became unruly and were being urged to lash out against corrections officers.  Plaintiff alleges in his complaint and states in a sworn declaration that he was pushed into a corrections officer by Sergeant Sigona, pulled out of the holding pen by his hair, and thrown to the floor and kneed in the nose.  During his deposition, however, plaintiff testified that five or six corrections officers rushed into the holding pen directing him to move to the back, which he could not do because there was no room.  Plaintiff's Dep. Tr. at pp. 16 and 51.  From there, plaintiff is not exactly sure what happened; he does not know whether he was pushed intentionally, only that "[he] was taken down . . . [and] . . . kneed in the nose."  *Id.* at p. 16.  Additionally, at the time of the incident, plaintiff did not know who the officers involved were, who "took him down", or who kneed him in the nose, and could not say whether there were also officers on the floor with him.[4]  *Id.* at pp. 16-17, 52.  Plaintiff further testified that after he fell to the floor, he was lifted and pulled out of the cage by his hair, and then he hit the floor again.  *Id.* at p. 18.  Again,

---

[4]    Plaintiff later learned the names of the officers he identified in his complaint when he received a copy of the misbehavior report that was issued to him as a result of the incident. Plaintiff's Dep. Tr. at p. 17.

plaintiff admittedly does not know how he ended up on the floor a second time, or whether he fell or the corrections officers fell on him, although he recalls that he was on the floor with a couple of corrections officers on top of him. *Id.*

Under the circumstances presented, even accepting as true plaintiff's version of the events, when considering the four factors informing the subjective analysis no reasonable factfinder could conclude that the force applied was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. Moreover, considering the extent of the force applied and the relatively minor injuries suffered even by plaintiff's account, coupled with the lack of evidence of malicious motives on the part of the corrections officers involved, I recommend a finding that the use of force was truly *de minimis* and did not abridge plaintiff's Eighth Amendment rights.[5]

### 2.    Failure to Intervene

A corrections worker who, though not participating, if present when an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen*, 17 F.3d

---

[5]    By plaintiff's own account, the injures suffered as a result of the incident were minor. *See* Plaintiff's Dep. Tr. at pp. 21-26.

552, 557 (2d Cir. 1994).  It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his or her presence by other officers.  *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004); *see also Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).  In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force.  *See Curley*, 268 F.3d at 72; *see also Espada v. Schneider*, 522 F. Supp. 2d 544, 555 (S.D.N.Y. 2007).  Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene.  *See, e.g., Schultz v. Amick*, 955 F. Supp.

1087, 1096 (N.D. Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia*, *Daniels v. Williams*, 474 U.S. 327, 335-36, 106 S. Ct. 662, 667 (1986)).

Based upon my finding that plaintiff's Eighth Amendment rights were not violated through the actions of defendant Manna, there can be no cognizable claim for liability on the part of defendants Sigona and Ruston for failure to intervene and protect plaintiff from the constitutional violation. *See Curley*, 268 F.3d at 72. I therefore recommend that plaintiff's claims against those defendants be dismissed as well.

    C.    Medical Indifference

The second component of plaintiff's complaint alleges that defendants Vega and Ryerson failed to provide him with needed medical treatment. Plaintiff's claim against Nurse Vega apparently stems from her failure, upon examining Cicio immediately following the March 7, 2006 incident, to arrange for him to see a doctor or to prescribe pain medication. The allegations against defendant Nurse Administrator Ryerson result from her alleged failure to process sick call slips submitted on several occasions following the incident by plaintiff. While plaintiff's summary judgment motion does not speak directly to this claim, he apparently seeks summary

judgment on the issue of liability on this claim as well.  For their part,

defendants urge dismissal of plaintiff's medical indifference claims as a

matter of law due to his failure to assert the existence of a serious medical

need and additionally for lack of any evidence to satisfy the subjective

element of the controlling test.

Claims that prison officials have intentionally disregarded an inmate's

medical needs are encompassed within the Eighth Amendment's

prohibition of cruel and unusual punishment.  *Estelle*, 429 U.S. at 104, 97

S.Ct. at 291 (1976).  The Eighth Amendment's prohibition of cruel and

unusual punishment proscribes punishments that involve the "unnecessary

and wanton infliction of pain" and are incompatible with "the evolving

standards of decency that mark the progress of a maturing society."  *Id.*;

*see also Whitley,* 475 U.S. at 319, 106 S. Ct. at 1084 (citing, *inter alia,*

*Estelle*).  While the Eighth Amendment does not mandate comfortable

prisons, neither does it tolerate inhumane treatment of those in

confinement; thus the conditions of an inmate's confinement are subject to

Eighth Amendment scrutiny.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114

S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349,

101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement – the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference".  *See Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson*, 501 U.S. 294, 111 S. Ct. 2321.  Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1978; *Leach*, 103 F. Supp. 2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).

### 1.   Serious Medical Need

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, "'sufficiently serious'".  *Hathaway v. Coughlin*,

37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson*, 501 U.S. at 298, 111 S. Ct. at 2324), *cert. denied sub nom.*, *Foote v. Hathaway*, 513 U.S. 1154, 115 S. Ct. 1108 (1995).  A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted).  A serious medical need can also exist where "'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'"; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts.  *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) (quoting, *inter alia*, *Chance*, 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'"  *Chance*, 143 F.3d at 701 (citation omitted); *Lafave v. Clinton County*, No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

     The record in this case fails to establish that plaintiff experienced a

serious medical need of constitutional proportions as a result of the

incident complained of.  Plaintiff alleges that during the incident he suffered

from a swollen and painful wrist as well as head pain.  Complaint (Dkt. No.

1) Statement of Facts ¶ 6; *see also* Plaintiff's Dep. Tr. at pp. 21-22, 24-26.

The record, including plaintiff's submission in support of his summary

judgment motion and later opposition to defendants' motion, fails to provide

further elaboration and contains no evidence of any extreme pain or

degeneration.  Instead, the record discloses only injuries of a transitory

nature which are insufficient to establish existence of a serious medical

need of constitutional proportions.  *Ford v. Phillips*, No. 05 Civ. 6646

(NRB), 2007 WL 946703, at * 12 (S.D.N.Y. Mar. 27, 2007) (finding that

minor bruising, slight bleeding, and abrasions are no injuries that may

produce death, degeneration or extreme pain and that no reasonable juror

could find otherwise).

### 2.     Deliberate Indifference

In addition to establishing the existence of a serious medical need, to

prevail on an Eighth Amendment claim a plaintiff must also establish

indifference to that condition on the part of one or more of the defendants.

*Estelle*, 429 U.S. at 104, 97 S. Ct. at 291.  Deliberate indifference, in a

constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *Leach*, 103 F. Supp. 2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S. Ct. at 1979); *Waldo*, 1998 WL 713809, at *2 (same).

It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of which diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment", and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients.  *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293; *Chance*, 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 264 (W.D.N.Y. 1998) (citation omitted).

The record now before the court fails to substantiate plaintiff's claims of deliberate indifference.  Even if plaintiff could establish the existence of a serious medical need, the record does not provide a basis for a

reasonable factfinder to conclude that either defendant Vega or defendant Ryerson was deliberately indifferent to such a need.  Plaintiff's claim against Nurse Vega is that on one occasion she failed to provide pain medication or to refer the plaintiff to a physician as a result of his injuries. Such an allegation of a single instance of delayed or denied medical care does not establish constitutional claim of medical deliberate indifference. *See Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

Turning to the allegations against defendant Ryerson, those stem from an alleged failure to process sick call slips on four or five occasions following the March 7, 2006 incident.  Even assuming the existence of a serious medical condition prompting the need for medical care and defendant Ryerson's failure to process sick call slips over a brief period of time, these facts alone do not suffice to establish a deliberate indifference claim as against defendant Ryerson since there is no evidence suggesting that the minimal delay caused any significant adverse effect to plaintiff's health.  *See Bumpus v. Canfield,* 495 F. Supp.2d 316, 324 (W.D.N.Y. 2007).  Accordingly, I recommend dismissal of plaintiff's deliberate indifference claim against defendant Ryerson on this alternative basis.

D.    Personal Involvement

28

In their motion defendants assert that even if plaintiff could establish

a cognizable excessive force or deliberate indifference claim, his cause of

action against defendant Graham, the superintendent at Auburn, is legally

insufficient based upon his lack of personal involvement in any conduct

forming the basis for those claims.

Personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under section 1983.

*Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of*

*Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)) and *McKinnon v. Patterson,*

568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct.

1282 (1978)).  In order to prevail on a section 1983 cause of action against

an individual a plaintiff must show some tangible connection between the

constitutional violation alleged and that particular defendant.  *See Bass v.*

*Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Importantly, a supervisor like Superintendent Graham cannot be

liable for damages under section 1983 solely by virtue of being a

supervisor; there is no *respondeat superior* liability under section 1983.

*Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at

501.  Vague and conclusory allegations that a supervisor has failed to train

29

or properly monitor the actions of subordinate employees will not suffice to

establish the requisite personal involvement and support a finding of

liability.  *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009) ("To the

extent that [a] complaint attempts to assert a failure-to-supervise claim . . .

[that claim is insufficient where] it lacks any hint that [the supervisor] acted

with deliberate indifference to the possibility that his subordinates would

violate [plaintiff's] constitutional rights.").  Culpability on the part of a

supervisory official for a civil rights violation can, however, be established

in one of several ways, including when that individual 1) has directly

participated in the challenged conduct; 2) after learning of the violation

through a report or appeal, has failed to remedy the wrong; 3) created or

allowed to continue a policy or custom under which unconstitutional

practices occurred; 4) was grossly negligent in managing the subordinates

who caused the unlawful event; or 5) failed to act on information indicating

that unconstitutional acts were occurring.  *Iqbal v. Hasty*, 490 F.3d 143,

152-53 (2d Cir. 2007), *rev'd on other grounds*, *sub nom*., *Ashcroft v. Iqbal*,

__ U.S. __, 129 S. Ct. 2931 (2009); *see also Richardson*, 347 F.3d at 435;

*Wright*, 21 F.3d at 501; *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir.

1986).

In my earlier report and recommendation, addressing a pre-answer dismissal motion filed by certain of the defendants including Superintendent Graham, I recommended against dismissing plaintiff's claim against defendant Graham, finding that the proof at trial could potentially establish that defendant Graham learned, through the appeal of plaintiff's grievance denial, that he was deprived of medical care at a point when he had an opportunity to cure that alleged constitutional deficiency. *See* Report and Recommendation dated February 10, 2009 (Dkt. No. 29) at pp. 17-21.  The more fully developed record now before the court, however, firmly establishes that this is not the case.  There is no indication that defendant Graham was aware of plaintiff's circumstances prior to plaintiff's appeal on April 12, 2006 of the IGRC's grievance denial.  *See* Graham Decl. (Dkt. No. 38-7) ¶ 6.  By that point, plaintiff had been transferred out of Auburn, and thus even if defendant Graham was placed on notice of a constitutional deprivation in the form of denial of adequate medical treatment, he was no longer in a position to cure that deficiency. *Id.*  Accordingly, because the record fails to disclose any basis on which defendant Graham could be held liable for the constitutional violations alleged, there is an independent, alternate basis for dismissing plaintiff's

31

claims against him.

IV.   SUMMARY AND RECOMMENDATION

The record in this case discloses no basis on which a reasonable factfinder could conclude that plaintiff's constitutional right to be free from cruel and unusual punishment was violated by defendant Manna during the course of the March 7, 2006 incident and that defendants Sigona and Ruston failed to intervene to prevent such a violation.  The record similarly discloses no basis on which a reasonable factfinder could conclude that plaintiff suffered injuries of constitutional significance as a result of that incident or that the defendants were subjectively indifferent to the medical needs presented by those injuries.  Finally, the record discloses no basis on which a reasonable factfinder could assign liability on the part of defendant Graham, as superintendent of the Auburn Correctional Facility. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 38) be GRANTED and that plaintiff's complaint be dismissed in its entirety, and that based upon that determination plaintiff's summary judgment motion (Dkt. No. 35) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     February 24, 2010
           Syracuse, NY



Page 1

Not Reported in F.Supp.2d, 2008 WL 877176 (N.D.N.Y.)
(Cite as: 2008 WL 877176 (N.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Reuben AVENT, Plaintiff,
v.
John DOE, Correctional Officer; Jack Doe, Correctional
Officer; K. Perlman, Superintendent; C. Parmita, I.G.P.;
Superintendent Graham; Glenn S. Goord,
Commissioner; Thomas Eagen; and Schweber, I.G.P.,
Defendants.
**No. 9:05-CV-1311 (FJS/GJD).**

March 31, 2008.

Reuben Avent, Auburn, NY, pro se.

Office of the New York State Attorney General, James J.
Seaman, AAG, of Counsel, Albany, NY, for Defendants.

**ORDER**

SCULLIN, Senior District Judge.

*1 In an Order and Report-Recommendation dated March
20, 2007, Magistrate Judge DiBianco recommended that
the Court grant Defendants' motion to dismiss and deny
Plaintiff's motion for joinder and to supplement his
complaint. *See* Dkt. No. 29. Plaintiff has filed objections
to those recommendations. *See* Dkt. No. 30.

It is somewhat difficult to comprehend the specific nature
of Plaintiff's objections. However, a review of the record
demonstrates that, in his objections, Plaintiff raises many
of the same arguments that he did in opposition to
Defendants' motion to dismiss. The Court finds such

objections without merit for the same reasons that
Magistrate Judge DiBianco rejected these arguments in his
Order and Report-Recommendation. Moreover, to the
extent that Plaintiff is requesting leave to file an amended
complaint, the Court denies that request as futile. *See
Tocker v. Philip Morris Cos., Inc.,* 470 F.3d 481, 491 (2d
Cir.2006) (holding that "a motion for leave to amend a
complaint may be denied when amendment would be
futile" (citation omitted)).

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge DiBianco's March 20,
2007 Order and Report-Recommendation is **ADOPTED
IN ITS ENTIRETY for the reasons stated therein;** and
the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's
complaint is **GRANTED;** and the Court further

**ORDERS** that Plaintiff's motion for joinder and to
supplement his pleading is **DENIED;** and the Court
further

**ORDERS** that the Clerk of the Court shall enter judgment
in favor of Defendants and close this case.

**IT IS SO ORDERED.**

**ORDER and REPORT-RECOMMENDATION**

GUSTAVE J. Di BIANCO, United States Magistrate
Judge.

This matter has been referred to me for Report and
Recommendation by the Honorable Frederick J. Scullin,
Jr., Senior United States District Judge pursuant to 28

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2008 WL 877176 (N.D.N.Y.)
(Cite as: 2008 WL 877176 (N.D.N.Y.))

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this amended civil rights complaint, plaintiff alleges that defendants denied him access to courts and denied him access to the prison grievance program in violation of his federal constitutional rights. (Dkt. No. 8). Plaintiff seeks injunctive and substantial monetary relief.

Presently before the court is defendants' motion to dismiss pursuant to FED. R. CIV. P.12(b)(6). (Dkt. No. 22). Plaintiff has opposed defendants' motion. (Dkt. No. 23). Defendants' have filed a reply. (Dkt. No. 24). Plaintiff filed a later motion for "joinder," and defendants have responded in opposition to that motion. (Dkt.Nos.25, 28). This court will consider all the pending motions in this recommendation.

## DISCUSSION

### 1. *Motion to Dismiss*

A court may not dismiss an action pursuant to Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (citing *inter alia Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The court must accept the material facts alleged in the complaint as true. *Id.* (citing *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam)). In determining whether a complaint states a cause of action, great liberality is afforded to *pro se* litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

*2 When considering a motion to dismiss for failure to state a claim, the court may consider the complaint, together with any documents attached as exhibits or incorporated by reference. See *Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1998). The court may also consider public documents and those of which judicial notice may be taken. *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773-74 (2d Cir.1991). When

matters outside the pleadings are presented, the court may either exclude those matters or treat the motion as one for summary judgment under FED.R.CIV.P. 56. FED. R. CIV. P. 12(b).

However, when a plaintiff chooses not to attach or incorporate by reference a document upon which he solely relies and that is integral to the complaint, the court may take the document into consideration without converting the motion. *Internat'l Audiotext Network v. American Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995). In order to be "integral" to the complaint, the complaint must rely heavily on the document's terms and effect." *Young v. Lee,* 432 F.3d 142, 146-47 (2d Cir.2005) (citations omitted). If the court is to consider this type of document, it must be clear that no dispute exists regarding the authenticity or accuracy of the document and that no material dispute exists regarding the relevance of the document. *Falkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006). One of the most important considerations is that when considering the sufficiency of a pro se complaint, the court must afford the plaintiff great liberality and apply less stringent standards than where a party is represented by counsel. *Branham v. Meachum,* 77 F.3d 626, 628-29 (2d Cir.1996).

### 2. *Facts*

Plaintiff begins the factual portion of his amended complaint by stating that in late 2004, he attempted to file a grievance at Coxsackie Correctional Facility "with" defendant Inmate Grievance Program (IGP) Supervisor Schweber. Amended Complaint (AC) ¶ 10. The subject matter of this grievance was apparently the alleged denial of plaintiff's personal and legal property for a period of "several hours." *Id.* This grievance also allegedly "expressed [plaintiff's] concern" over his legal materials relating to a federal action that he was pursuing, which also alleged the deprivation of legal property. AC ¶ 11.

According to plaintiff, defendant Schweber would not allow plaintiff to file this grievance because there was a policy of denying inmates the right to pursue grievances that could ultimately lead to a civil suit against officers, officials, and against the State itself. AC ¶ 12. Plaintiff states that he later filed a grievance with defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 877176 (N.D.N.Y.)
(Cite as: 2008 WL 877176 (N.D.N.Y.))

Thomas Eagen, claiming that he was not allowed to file the previously mentioned grievance "complaining of the imminent unconstitutional deprivation of [plaintiff's] legal property." AC ¶ 13. Plaintiff states that he was attempting to obtain "precautionary" relief from defendant Eagen, but the grievance to defendant Eagen was rejected, and plaintiff "left without any administrative relief." *Id.*

**\*3** Plaintiff states that on July 7, 2005, he was transferred to Mid-State Correctional Facility. AC ¶ 14. Plaintiff states that he "insisted" at Coxsackie, that one of his bags of "miscellaneous property" be sent to him by mail instead of one of his four other bags, containing "active legal materials." AC ¶ 15. Plaintiff states that the processing officer refused, and instead forced plaintiff to choose one of the "legal" draft bags to send by mail, rather than allow the bag to travel with plaintiff to Mid-State. AC ¶ 15. Plaintiff states that he chose the lightest legal draft bag, and that he was charged $ 33.50 to send this bag to Mid-State. *Id.*

Plaintiff alleges that while he was housed at Mid-State he was not allowed to have any legal materials, regardless of any court deadlines. AC ¶ 16. He states that he was allowed to take "personal" books out of the four bags which apparently contained a great deal of legal material. AC ¶ 17. Plaintiff states that although there were only four of his bags at Mid-State during July and August, he was not allowed to go through his property, rather the property was spread out over a table and he was forced to point to the personal items that he wanted. AC ¶ 18.

Plaintiff claims that "sometime thereafter," he filed three grievances, apparently claiming that the officials at Mid-State would not let him have his legal materials so that he could pursue his federal lawsuits. AC ¶ 19. Plaintiff also states that he filed a motion for an extension of time in one of his federal court cases [FN1] because Mid-State would not let him have his legal materials for his "active" cases. AC ¶ 19. Plaintiff states that although all three grievances were filed, he was made to "sign off" on them after IGP Supervisor, Virkler (not named as a defendant in this case) and an unknown Sergeant visited plaintiff's cell and told him to just write to the courts for an extension of time. AC ¶¶ 20-21.

FN1.*Avent v. Filion,* 03-CV-6709 (SDNY).

Plaintiff claims that the unknown Sergeant told plaintiff that if he "want[ed] to be an asshole, and take it to a hearing," they could be "asshole[s]" too. AC ¶ 20. Plaintiff appears to state that one of the three grievances was against defendant Corrections Officer Jones, the Mid-State Law Library officer who delivered books to inmates confined in the Special Housing Unit [FN2] (SHU). *Id.* Plaintiff complained that this individual did not hand out paper, envelopes, or carbon paper to inmates so that they could draft "legal motions." AC ¶ 21.

FN2. Plaintiff was apparently confined to the Special Housing Unit upon his arrival at Mid-State.

Plaintiff states that the following week, his cell was searched by defendant Jones, who placed handcuffs and shackles on plaintiff that were so tight they "could have" cut into plaintiff's flesh. AC ¶ 22. Plaintiff then "spoke to" defendant Jones regarding whether this was done in retaliation for the grievance about the Law Library, and defendant Jones allegedly told plaintiff that if he "wanted" his constitutional rights, he should not "come to prison" and then told plaintiff that he had money to buy paper. *Id.*

**\*4** Plaintiff claims that on several occasions while plaintiff was "double bunked" with another inmate, he and plaintiff were deprived of legal books, paper, envelopes, and carbon paper by defendant Jones. AC ¶ 23. Plaintiff claims that "sometime" in early September of 2005, plaintiff "finally received his legal draft bag" after he had filed several grievances and claim forms regarding the bag that had been mailed separately from Coxsackie. AC ¶ 24. Plaintiff states that he was taken to get his property by defendant Jones. AC ¶ 24.

Plaintiff alleges that on September 5, 2005, three days after he received his legal draft bag, he was "packed up" by defendants John and Jack Doe, who told plaintiff and his roommate to go out to the recreation pen while Jack Doe took plaintiff's full draft bag of legal work and other personal property. AC ¶ 26. Plaintiff claims that defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 877176 (N.D.N.Y.)
(Cite as: 2008 WL 877176 (N.D.N.Y.))

Jack Doe returned to plaintiff's cell and forced plaintiff to sign an incomplete I64 form,[FN3] over plaintiff's objections. AC ¶ 27. Plaintiff states that he objected to signing the form because it only took defendant Jack Doe ten minutes to complete the form, and he could not have gone through all plaintiff's property in that short period of time. *Id.*

> FN3. The I64 form appears to be an inventory form for an inmate's property that is transferred from one facility to another. *See* Plaintiff's Exs. F1 & F2.

Plaintiff states that he was transferred to Downstate Correctional Facility on September 6, 2005 and then to Auburn Correctional Facility on September 7, 2005. AC ¶ 28. Plaintiff states that when he was given his property on September 9, 2005, there were only four draft bags and no I64 form. AC ¶ 29. Plaintiff states that "days later," he found out that his "3 other legal draft bags" were "plundered of all his active legal work," and it appears that plaintiff is claiming that the other property that he had in his Mid-State cell was mixed in with his "missing" legal materials." AC ¶ 29.

Plaintiff states that he did not know whether "such" was done in good faith, whether the materials were mailed "sua sponte" by Mid-State, or whether the property was "unlawfully deprived and destroyed." AC ¶ 30. Thus, plaintiff states that on September 12, 2005, he filed a grievance, stating that plaintiff had a fifth draft bag that was not accounted for, nor did he have an I64 form detailing his property. *Id.* Plaintiff stated that this fifth bag contained important legal work that he needed for "immediate court deadlines." *Id.* Basically, he was requesting why Mid-State did not send the bag, and if the facility had sent the bag, plaintiff wished to know its location. *Id.*

Plaintiff alleges that shortly thereafter, he filed another grievance and also sent letters to the courts in which his "active" actions were pending, stating that he had been "deprived" of his legal materials and requesting whatever relief was possible. AC ¶ 31. On September 20, 2005, plaintiff states that he filed a "lost property" claim with the Auburn Inmate Accounts Officer, and on September 27,

2005, he wrote to Auburn's Grievance Committee and Inmate Accounts Officer, telling them that he filed a grievance on September 12, 2005 and that he did not receive a hearing or any other response. AC ¶ 32.

**\*5** Plaintiff states that on September 27, 2005, the same day that he wrote the above letters, he received a denial of the property deprivation grievance, and he immediately appealed this denial to defendant Superintendent Graham. AC ¶ 33. Plaintiff also received his I64 forms in the facility mail on September 27, 2005. AC ¶ 34. Plaintiff claims that neither of the two I64 forms accompanied plaintiff's four bags of property when the bags were given to him at Auburn. AC ¶ 35. Plaintiff states that there was no notification that extra property bags were either kept or mailed by Mid-State. AC ¶ 35.

Plaintiff then asserts that the lack of a "reasonable printed name or signature" of either John or Jack Doe on the I64 forms implies that these defendants acted with the "intention of destroying and/or obtaining" some of plaintiff's legal documents and with the intent of destroying or depriving plaintiff of materials that might be important to his cases. AC ¶ 36.

Plaintiff then states that the draft bags, issued by the Department of Correctional Services, are all equal in size and that plaintiff had one bag full of miscellaneous items, and four bags of legal materials consisting of paper, including the bag that cost plaintiff $ 33.50 to send when he was transferred to Mid-State. AC ¶ 38. Plaintiff then states that during his stay at Mid-State "he collected another 10 pounds of legal papers," and that it was impossible for plaintiff's fifth bag, containing all his legal papers to cost him only $ 18.26 to mail. AC ¶ 39. Plaintiff seems to be alleging that if the bag was only going to cost $ 18.26 to mail, then it could not contain all the legal documents that it should have and thus, some documents must have been destroyed.

Plaintiff states that on September 28, 2005, he again wrote to all the courts in which he had pending actions notifying them of this problem, and he also sent the letter as a grievance to Mid-State SHU, so that they would not destroy the materials, pending an investigation "to assure

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 877176 (N.D.N.Y.)
(Cite as: 2008 WL 877176 (N.D.N.Y.))

the lawful return of [plaintiff's] property in full and not just $ 18.26 worth of it in weight." AC ¶ 40.

Plaintiff alleges that his Mid-State grievance was rejected on October 4, 2005, and he was told to file the grievance at Auburn, his current facility. AC ¶ 41 & Plaintiff's Ex. J. On the same day, plaintiff filed the grievance at Auburn, but it was rejected by defendant Parmiter because it was "untimely." AC ¶ 42. Plaintiff alleges that defendant Parmiter rejected the grievance "informally" rather than with an "official" response. *Id.* & Plaintiff's Ex. L.

Plaintiff states that he filed another grievance on October 7, 2005, complaining about defendant Parmiter's rejection of the October 4, 2005 grievance and complaining about the lack of a "formal" rejection. AC ¶ 43. Plaintiff's concern is that because the rejection consisted of what appears to be a "post-it note", plaintiff could later be accused of not attempting to follow the grievance procedure and would then be precluded from obtaining judicial relief because he failed to exhaust his administrative remedies. AC ¶ 43.

**\*6** Plaintiff also claims that defendant Parmiter acted outside the scope of DOCS Directives when she rejected plaintiff's October 4, 2005 grievance because it was filed within the fourteen day period provided by Directive # 4040. AC ¶ 44. Plaintiff argues that the grievance was timely because the "acts" were ongoing and new facts were discovered regarding the alleged deprivation of plaintiff's property. AC ¶ 44.

Plaintiff claims that all the defendants were acting according to instructions, training, and official policy of defendants Graham, Perlman, Goord, and Eagen who "directly participated and enforced these actions." AC ¶ 45. Plaintiff states that each individual acted with actual or implied knowledge and malice toward plaintiff and toward African Americans "in general." AC ¶ 46. Plaintiff claims that defendants had a policy and custom of interfering and precluding plaintiff from obtaining access to courts. AC ¶ 47.

Plaintiff alleges that defendants deprived him of his legal

materials from July 7, 2005 until the filing of the amended complaint. AC ¶ 48. Plaintiff also claims that defendants had no right to separate plaintiff's "active legal property" from his other property, and did so "maliciously." AC ¶ 49. Plaintiff alleges that defendants had no right to deprive plaintiff of his "active legal property" and then charge him for its "partial return" after the deprivation was discovered, nor do they have a right to destroy plaintiff's property if he does not pay for the shipping. AC ¶ 50.

Plaintiff states that as a result of defendants' actions he could not file an "opposition Reply Motion" to the Attorney General's papers in plaintiff's Court of Appeals case *Avent v. New York State,* 02-CV-828, App. No. 03-24. AC ¶ 51. Plaintiff also states that he could not file a response in his habeas corpus action, *Avent v. Filion,* 03-CV-6709. Plaintiff states that the case was "extended" for three months because of defendants' actions. *Id.* Plaintiff alleges that he is unable to meet the extended deadlines in all his cases, including *Avent v. Solfaro,* 02-CV-914, which was scheduled for submission of a final pretrial order by plaintiff, and he was deprived of half of his exhibits. Plaintiff also claims that he is precluded from discovery and substantive motion filing in *Avent v. Annucci,* 04-CV-302. *Id.* Plaintiff states that his June 2005 discovery request was never answered, and he could not do anything about it because of defendants' actions and now plaintiff's "time to do so" has expired. *Id.* Plaintiff alleges that due to the delay caused by defendants' actions, many of plaintiff's witnesses will have been released from jail and will be difficult to find, thus, material testimonial evidence "has been destroyed by defendants' actions." *Id.*

Plaintiff also appears to allege that defendants Goord and Eagen had an unconstitutional custom or policy and failed to properly train the Inmate Grievance Program (IGP) officials and had a policy or custom of overlooking illegal behavior by these individuals. AC ¶ 55. Plaintiff states that defendants Eagen, Schweber, and Parmiter improperly used their positions to preclude "any future judicial intervention." AC ¶¶ 56.

**\*7** A careful reading of the amended complaint shows that plaintiff is making two versions of his access to courts claim. First, he claims that the failure of defendants to provide him with his fifth draft bag filled with legal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 877176 (N.D.N.Y.)
(Cite as: 2008 WL 877176 (N.D.N.Y.))

materials deprived plaintiff of access to courts. AC ¶¶ 48-51. Second, plaintiff claims that the IGP officials improperly prevented plaintiff from filing grievances so that he would be unable to exhaust his administrative remedies and be precluded from suing in federal court for civil rights violations .[FN4] AC ¶¶ 54-56.

> FN4. The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a) requires an inmate to exhaust his administrative remedies prior to bringing a federal civil rights action and applies to *all inmate suits about prison life,* whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir.2004).

**3. *Eleventh Amendment***

Plaintiff seeks damages against the defendants in their "official" as well as individual capacities. It is now well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n. 3.

An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory v. Perales,* 984 F.2d 84, 87 (2d Cir.1991). Thus, to the extent that the complaint seeks damages against defendants in their "official capacities", the complaint may be dismissed. The complaint may proceed as against the defendants in their "individual capacities."

**4. *Access to Courts***

In *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court held that access to the courts is a fundamental right that requires prison

authorities to "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." The Supreme Court has also held that an inmate alleging a denial of access to courts must show *actual injury* as a result of the deficient access to courts. *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The *cause of the injury* must be inadequacy of the access. *Id.* at 351. Plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials. *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998) (quoting *Lewis v. Casey,* 518 U.S. at 353).

**A. Improper Grievance Procedures**

In his amended complaint, plaintiff names the IGP Supervisor at Coxsackie, Bradley Schweber; the IGP Supervisor at Auburn, Cheryl Parmiter; and the IGP Director in Albany, Thomas Eagen. Plaintiff also appears to claim that defendant Commissioner Goord and defendant Eagen failed to properly train the IGP officials, making defendant's Goord and Eagen responsible for the IGP defendants' allegedly unconstitutional actions.

The court notes that plaintiff has also named Mid-State Superintendent Kenneth Pearlman and Auburn Superintendent Harold D. Graham as defendants. Defendants Pearlman and Graham are clearly supervisory defendants. Although defendant Graham is mentioned in the amended complaint as being involved in the denial of plaintiff's grievances, it is unclear what involvement defendant Pearlman is alleged to have had with respect to plaintiff's case.[FN5]

> FN5. The court notes that personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and that *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). The court understands that an allegation that the supervisory official had a "policy" that allowed the constitutional violation occurred may be used

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 877176 (N.D.N.Y.)
(Cite as: 2008 WL 877176 (N.D.N.Y.))

to support a claim of personal involvement by a supervisory defendant. *See* *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (a supervisory official may be personally involved in a constitutional violation if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue). Although plaintiff in this case alleges generally that the supervisory defendants had a "policy" supporting these constitutional deprivations, his allegations against defendant Pearlman are almost non-existent. Additionally, plaintiff does not claim that he filed grievances or appeals of those grievances at Mid-State that might have been seen by defendant Pearlman. Thus, the lack of personal involvement would be a separate basis for dismissal against defendant Pearlman. Since the court is recommending dismissal on the merits, and defendants did not argue this basis for dismissal, it is unnecessary for this court to rely upon this basis and has not done so in this decision. It is mentioned solely as an alternative.

**\*8** Regardless of what plaintiff alleges with respect to the IGP defendants, plaintiff's amended complaint may be dismissed. First, the law is clear that plaintiff has no constitutional right to have his grievances processed at all, or if processed, to have the procedure done properly. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003). A violation of the inmate grievance procedures does *not* give rise to a claim under section 1983. *Cancel v. Goord,* No. 00-Civ.2042, 2001 U.S. Dist. LEXIS 3440, 2001 WL 303713 (S.D.N.Y. Mar. 29, 2001). Thus, to the extent that plaintiff alleges that grievances were not processed or were not processed properly, whether by the IGP supervisors or defendant Eagen, or alleges that defendants Eagen and Goord did not properly supervise the IGP program, the complaint may be dismissed.

The court is well-aware that plaintiff is claiming *more* than the improper processing of his grievances. Plaintiff claims that defendants are deliberately failing to process grievances so that plaintiff will later be denied access to courts based on his failure to exhaust administrative remedies. Once plaintiff's claim changes to a denial of

access to courts, the standard articulated in *Lewis v. Casey, supra* applies, and plaintiff must show an *actual injury* as the result of defendants actions. As stated above, plaintiff must show that a non-frivolous action was frustrated or impeded *due to defendants' actions.* *Lewis v. Casey,* 518 U.S. at 353.

Plaintiff claims that in "late 2004," plaintiff attempted to file a grievance with defendant Schweber, alleging that plaintiff had been denied his legal materials for 816 hours. AC ¶ 10. Plaintiff alleges that defendant Schweber did not allow plaintiff to file this grievance because there was a "policy" about allowing grievances that would ultimately lead to a civil suit against the officers or the state. AC ¶ 12. Plaintiff alleges that he later tried to file a grievance directly with defendant Eagen, complaining that he was not allowed to file a grievance regarding the "imminent" unconstitutional deprivation of his legal property. AC ¶ 13. Plaintiff states that this grievance was also rejected by defendant Eagen, leaving plaintiff "without any administrative relief." *Id.*

The court notes that even assuming the truth of plaintiff's allegations, he has not shown that there was any actual injury that resulted from either defendant Schweber's or defendant Eagen's actions. Plaintiff himself states that he was deprived of his legal property for a period of 8-16 hours, and these allegations have *nothing to do with the ultimate claim* that he makes in this action regarding deprivation of his legal materials. Plaintiff makes no claim that the denial of this grievance caused any injury whatsoever. There is no claim that plaintiff attempted to file a federal action claiming the denial of his legal material, that was denied for failure to exhaust administrative remedies. Thus, the amended complaint may be dismissed in its entirety as against defendant Schweber.

**\*9** The court also notes that a defendant's intentional act, preventing plaintiff from filing a grievance has been, and continues to be an *exception to the exhaustion requirement.* *See* *Brownell v. Krom,* 446 F.3d 305, 311-12 (2d Cir.2006) (citation omitted). In *Brownell,* the Second Circuit articulated a "three part inquiry" to determine whether an inmate fulfilled the PLRA exhaustion

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 877176 (N.D.N.Y.)
(Cite as: 2008 WL 877176 (N.D.N.Y.))

requirement. The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether *defendants' own actions inhibiting exhaustion estops them from raising the defense;* and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.* There is no incentive for defendants to develop a "policy" preventing inmates from exhausting their administrative remedies since the law is quite clear that the defendants actions may estop them from raising the defense.[FN6] Even if such a policy existed, in this case, it did not prevent plaintiff from filing any federal non-frivolous actions.

> FN6. Even after *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), where the Supreme Court held that the PLRA's exhaustion requirement mandates "proper" exhaustion of administrative remedies, Justice Breyer, in his concurring opinion, specifically noted that two circuits, the *Second* Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford* ] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford,* 126 S.Ct. at 2393 (citing *Spruill v. Gillis,* 372 F.3d 218, 232 (3d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)) (Breyer, J. concurring). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a *traditional exception that the statute implicitly incorporates."Id.* (emphasis added). Thus, if a defendant intentionally prevents a plaintiff from filing a grievance, particularly with the intent of preventing plaintiff's later federal court claim, this will be an exception to the exhaustion requirement.

The same is true for defendant Parmiter's alleged denial of a hearing on plaintiff's September 12, 2005 grievance or defendant Parmiter's denial of plaintiff's October 4, 2005 grievance as "untimely." Plaintiff complains that defendant Parmiter violated DOCS directives by denying the October 4, 2005 grievance with a "peal [sic] off sticker" rather than a "recorded official response." AC ¶

43 & Ex. L. Plaintiff cannot show that the denial of either grievance prevented plaintiff from filing a lawsuit complaining about the deprivation of his fifth draft bag of property.

Clearly, there was no actual injury since plaintiff has filed *this lawsuit,* challenging the alleged denial or deprivation of the fifth bag of legal property, and *defendants in this case have not argued that plaintiff failed to exhaust his administrative remedies.* Thus, plaintiff can show *no actual injury* based upon defendant Parmiter's actions, and the entire complaint may be dismissed as against defendant Parmiter.

Plaintiff claims that either defendant Parmiter failed to mail plaintiff's appeal [FN7] to defendant Graham or that defendant Graham failed to respond to plaintiff's September 27, 2005 grievance appeal. Plaintiff's Ex. E. Since plaintiff can show no actual injury as the result of either defendant Parmiter's actions or defendant Graham's actions, the complaint may be dismissed as to both of these defendants, and plaintiff's second cause of action alleging denial of access to courts based upon improper grievance procedures may be dismissed in its entirety.

> FN7. Plaintiff's Ex. K.

**B. Denial of Legal Materials**

The basis of plaintiff's claim is that the failure to transfer his fifth draft bag, containing a substantial amount of plaintiff's legal materials, from Mid-State to Auburn caused the denial of plaintiff's access to courts because this bag contained material relevant to four of plaintiff's pending federal cases. Plaintiff claims that the denial of the legal materials contained in that fifth bag adversely affected his ability to pursue his legal actions: *Avent v. Solfaro,* 02 Civ. 914 (S.D.N.Y.); *Avent v. New York,* No. 03-24 (2d Cir.), 02-CV-828 (W.D.N.Y.); *Avent v. Filion,* 03 Civ. 6709 (S.D.N.Y.); *Avent v. Filion, et al.,* 04-CV-302 (N.D.N.Y.).

**\*10** The court would first point out that plaintiff himself

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 877176 (N.D.N.Y.)
(Cite as: 2008 WL 877176 (N.D.N.Y.))

submits an exhibit indicating that he was told on September 23, 2005 that Mid-State Correctional Facility *still had plaintiff's property.* Plaintiff's Ex. G. The letter is from Jean M. Yost, Steward and states that in order for Mid-State to forward plaintiff's property, plaintiff would have to pay $ 18.26. *Id.* Plaintiff could have the postage deducted from his inmate account. *Id.* The letter did state that if Mid-State were not notified by plaintiff's "Inmate Accounts office" within 30 days, the property would be destroyed. *Id.*

Plaintiff states in the amended complaint that he received this letter. AC ¶ 37. Instead of attempting to obtain this bag, plaintiff implies that this bag could not contain all his legal materials since a bag that he had mailed cost him $ 33.50 to send.[FN8] AC ¶¶ 38-39. Plaintiff states that during his stay at Mid-State he "collected another 10 pounds of legal papers," and it was, therefore, "impossible for Avent's 5th bag containing all legal work as before to cost him $ 18.26 to send out." AC ¶ 39. Thus, without ever seeing the bag or taking inventory of what was in the bag, plaintiff was convinced that somehow his legal property had been removed or destroyed, perhaps by the John Doe defendants who had packed his belongings. AC ¶¶ 25-27.

> FN8. There is a four-bag limit when an inmate is transferred from one facility to another. DOCS Directive 4913 *cited in Salahuddin v. Coughlin, 591 F.Supp. 353, 356-57 (S.D.N.Y.1984).* Plaintiff is well-aware of this rule since he states that upon his transfer to Mid-State he paid $ 33.50 to ship the fifth bag of property. AC ¶ 15; Plaintiff's Ex. B at p. 2.

Instead, plaintiff filed this action on October 18, 2005. (Dkt. No. 1). Plaintiff signed the original complaint on October 13, 2005, approximately one week after defendant Parmiter's October 6, 2005 denial of plaintiff's October 4, 2005 grievance as untimely. Plaintiff, thus, has no idea what could have been in that fifth bag of property, even assuming that it was not the "full" bag. Plaintiff cannot create his own denial of access to courts by refusing to obtain the property that is being held for him.[FN9]

> FN9. The court also notes that although unnecessary to this decision, defendants allege that plaintiff's fifth bag was never destroyed and is still available for plaintiff to ship. Shipment currently costs $ 19.07. Relf Aff. ¶ 10 (attached to defendants' reply papers).

Notwithstanding the above, the court will focus on whether plaintiff has sufficiently stated actual injury as the result of his alleged denial of legal documents. Plaintiff claims that as a result of defendants' actions, he could not file an "opposition Reply motion to the attorney general's [sic] adverse motion in his Second Circuit Court of Appeals case. Although plaintiff does not state what papers were missing that prevented him from doing this, the court notes that on December 2, 2005, the Second Circuit reversed the *sua sponte* dismissal of plaintiff's Western District of New York case, and sent the case back to the District Court for further proceedings. *Avent v. New York,* 157 Fed. Appx. 375 (2d Cir. Dec.2, 2005).

*Avent v. New York* is a case in which plaintiff is again claiming denial of access to courts. Plaintiff was granted *in forma pauperis* status to pursue the appeal on April 18, 2005. *Id.* at 376. In the Second Circuit opinion, the court stated that it directed plaintiff to brief " 'the specific harm to his civil cases and divorce action that access to the law library would have prevented.' " *Id.* at 377. The court then stated that "[a]fter reviewing Avent's complaint and his brief, we are satisfied that he may be able to state a claim for the denial of access to the courts if given an opportunity to amend his complaint." *Id.*

**\*11** Clearly, whatever denial of legal materials plaintiff alleges he suffered, it did not affect his ability to pursue and win his appeal to the Second Circuit. It is unclear what plaintiff is referring to when he states that he could not file an "opposition Reply Motion" in that case, but even assuming that this statement were true, it did not adversely affect this action. Thus, plaintiff cannot show "actual injury" in his Second Circuit action.

Plaintiff seems to claim that he was unable to file something in his Southern District of New York habeas corpus action,[FN10] and that defendants' actions caused

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 877176 (N.D.N.Y.)
(Cite as: 2008 WL 877176 (N.D.N.Y.))

plaintiff to be unable to "meet the extended deadlines." AC ¶ 51. Defendants have submitted as Exhibit F, the Report-Recommendation of the Honorable Magistrate Judge George Yanthis. Magistrate Judge Yanthis recommended that the court deny plaintiff's habeas corpus action as time-barred. Defendants' Ex. F.

FN10. *Avent v. Filion,* 03 Civ. 6709 (S.D.N.Y.).

In this case, plaintiff does not allege what materials he was denied that would have changed Magistrate Judge Yanthis's recommendation or the District Court's later affirmance of that recommendation. This court notes that the Southern District had originally denied the petition as time-barred on September 4, 2003. *Id.* at 2. The Second Circuit vacated the judgment and remanded to the District Court to allow plaintiff (then petitioner) notice and opportunity to be heard on the timeliness issue. *Id.* at 3. Plaintiff filed an amended petition in that case on June 4, 2004, offering an explanation for the delay in filing his petition. *Id.* at 3. In a footnote, it is clear that then-Chief Judge Mukasey specified exactly what plaintiff was to argue regarding why the petition should be equitably tolled. *Id.* at 3 n. 3.

It is clear from Magistrate Judge Yanthis's recommendation that plaintiff had already submitted whatever argument he had in support of his claim that the petition should not be denied as time-barred. There is absolutely no indication that the denial of any legal materials, beginning in July of 2005 was the cause of the dismissal of plaintiff's habeas action.

Plaintiff also claims that the denial of legal materials adversely affected *Avent v. Solfaro,* 1:02 Civ. 914 (S.D.N.Y.). At the time plaintiff wrote the amended complaint in this action, plaintiff alleged that he was supposed to file a "final pretrial order" in *Avent v. Solfaro,* and that half of the case exhibits were missing. As stated by defendants, plaintiff filed *Avent v. Solfaro* on February 6, 2002. Seaman Aff. Ex. A (Docket Sheet in 02 Civ. 914, Dkt. No. 1). The case proceeded for several years, and on January 23, 2006, plaintiff stated during a telephone conference, that he had lost legal documents when he was transferred to Auburn. *Id.* (Docket Sheet, Minute Entry of

Jan. 23, 2006 telephone conference). The court ordered defendants to make a copy of the case file. *Id.* Both parties requested that they be able to file motions for summary judgment simultaneously. *Id.*

**\*12** The docket sheet also shows that on March 15, 2006, a letter addressed to Judge Casey from Alexander Saunders stated that plaintiff had "all the records that [defendants] have." *Id.* Thus, plaintiff was able to obtain all the records in the case prior to the motions deadline, and he can show no actual injury to *Avent v. Solfaro,* resulting from any action of any of the defendants in this case.

Finally, plaintiff alleges that he is "precluded from discovery and substantive motion filing in *Avent v. Filion (Annucci),* 04-CV-302, pending in the Northern District of New York. Once again, plaintiff has failed to allege what documents he is missing that would prevent him from discovery and "motion filing." The court notes that plaintiff made a motion to compel on June 12, 2006, restating several dates, including the date that he served his first set of interrogatories on defendants. (Dkt. No. 47). The motion further states that plaintiff was deprived of his legal materials, and that these materials were "destroyed", however defendants in 04-CV-302 "have sent Avent a copy of his discovery requests on May 9, 2006." *Id.* at 1 (footnote).

Thus, the defendants' actions did not prevent plaintiff from filing a discovery motion, and defendants had apparently already provided plaintiff with a copy of the document that he said he needed. Defendants filed a response to the motion on July 31, 2006. (04-CV-302, Dkt. No. 58). Plaintiff filed a reply on August 11, 2006. (04-CV-302, Dkt. No. 59). On February 6, 2007, Magistrate Judge Treece **granted** plaintiff's motion to compel. (04-CV-302, Dkt. No. 61). The motion to compel filing deadline was extended until April 30, 2007 in order to resolve any issues that might arise regarding defendants' responses to plaintiff's discovery demands, and the dispositive motion deadline has been extended until May 31, 2007. *Id.* at p. 7.

Thus, plaintiff has not been injured by any deprivation of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 877176 (N.D.N.Y.)
(Cite as: 2008 WL 877176 (N.D.N.Y.))

his legal materials, and plaintiff's speculative claim that he will be prevented "in the future" from presenting evidence, arguments, and exhibits does not state actual injury resulting from the actions of any of the named defendants in this case. It is clear that any delays in plaintiff's actions were not due to the deprivation of plaintiff's legal materials, and plaintiff's claim that the delays have caused inmate witnesses to be released from prison is simply not related to defendants' alleged actions in this case.[FN11]

> [FN11.](#) As stated above, plaintiff may still obtain his fifth bag of property simply by paying the shipping. He may then recover some of the materials that he states are missing.

## C. Corrections Officer Jones

The court would simply note that although plaintiff names Corrections Officer Jones as a defendant, it is unclear what claims plaintiff is attempting to make against this officer. Plaintiff claims that he wrote a grievance against defendant Jones, who apparently was the Mid-State Law Library Officer. AC ¶ 21. Plaintiff alleges that one week later, defendant Jones searched plaintiff's cell and placed handcuffs on plaintiff that were so tight that they "could have" cut into plaintiff's skin. AC ¶ 22. Plaintiff then alleges that he and his roommate were denied legal books, paper, envelopes, and carbon paper by defendant Jones on several unspecified occasions. AC ¶ 23. Finally, plaintiff alleges that sometime in September of 2005, defendant Jones told plaintiff in "amusement" that he could have his property. AC ¶ 24.

**\*13** None of the allegations made against defendant Jones show that anything allegedly done by this defendant denied plaintiff his access to courts. Plaintiff never alleges that any actions taken by this defendant caused plaintiff "actual injury" to any of the actions mentioned in the amended complaint. The fact that handcuffs were placed on plaintiff tightly so that they "could have" cut him does not rise to the level of a constitutional violation.[FN12]

> [FN12.](#) The Eighth Amendment prohibits the " 'unnecessary and wanton infliction of pain.' "

*Baker v. Willett,* 42 F.Supp.2d 192, 196 (N.D.N.Y.1999) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Although plaintiff in this case never raises an Eighth Amendment claim, the court would merely point out that nothing alleged against defendant Jones with respect to the handcuffs would even come close to alleging a constitutional violation in this regard.

## 5. *Motion to Supplement*

FED. R. CIV. P. 15(d) allows a party to supplement a pleading with matters that occurred *after the filing of the original complaint, but pertain to the original pleading.Albrecht v. Long Island Rail Road,* 134 F.R.D. 40, 41 (E.D.N.Y.1991). A party may supplement to include subsequent occurrences "absent prejudice to the nonmoving party." *Id.* The court may grant a motion to supplement even though the original pleading is defective in its statement of a claim. FED. R. CIV. P. 15(d).

The standard for a motion to supplement is the same as for a motion to amend the pleadings under Rule 15(a). *Klos v. Haskell,* 835 F.Supp. 710, 715 (W.D.N.Y.1993) (Fisher, M.J.), *adopted by* 835 F.Supp. at 713 (W.D.N.Y.1993) (Telesca, D.J.). Generally, the court has discretion whether or not to grant leave to amend [a pleading]. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). However, in exercising this discretion, the court must act pursuant to Fed.R.Civ.P. 15(a), granting leave to amend "freely ... when justice so requires." Fed.R.Civ.P. 15(a); *Id.* at 182.

In deciding whether to exercise its discretion, the court must examine whether there has been undue delay, bad faith, or dilatory motive on the part of the moving party. *Evans v. Syracuse City School District,* 704 F.2d 44, 46 (2d Cir.1983) (citing *Foman,* 371 U.S. at 182). The court must also examine whether there will be prejudice to the opposing party. *Kovian v. Fulton County National Bank,* 86-CV-154, 1992 U.S. Dist. LEXIS 7023, 1992 WL 106814 (N.D.N.Y. May 13, 1992). Finally, where it

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 877176 (N.D.N.Y.)
(Cite as: 2008 WL 877176 (N.D.N.Y.))

appears that granting leave to amend is unlikely to be productive or the amendment is futile, it is not an abuse of discretion to deny leave to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted).

On October 23, 2006, plaintiff made a motion for joinder and to supplement pleadings. (Dkt. No. 25). Plaintiff has included a host of exhibits with his motion. (Dkt. No. 25). Defendants have opposed the motion. (Dkt. No. 28). Plaintiff seeks to add ten new defendants and many new allegations to this action. Plaintiff has already filed one amended complaint in this action, and this court has found that the complaint does not state a claim for denial of access to courts.

The court would first note that as argued by defendants, plaintiff has not submitted a supplemental pleading that is numbered sequentially to the pleading that his is attempting to supplement. This failure would mandate the denial of plaintiff's motion in the first instance. However, the court also notes that plaintiff is attempting to add new defendants and claims that are completely unrelated to the central issues in the amended complaint. These unrelated claims include denial of meals in 2005 and 2006 and some disciplinary problems in December of 2005. (Dkt. No. 25). The court also notes that none of the information submitted by plaintiff affects this court's decision in this case. Therefore, the court must deny plaintiff's motion for joinder and to supplement.

**\*14WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 22) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY,** and it is further

**ORDERED,** that plaintiff's motion for joinder and to supplement (Dkt. No. 25) is **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written

objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989));* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.
Avent v. Doe
Not Reported in F.Supp.2d, 2008 WL 877176 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- S.Ct. ----, 2010 WL 596513 (U.S.)
(Cite as: 2010 WL 596513 (U.S.))

Only the Westlaw citation is currently available.

Supreme Court of the United States
Jamey L. WILKINS, Petitioner,
v.
Officer GADDY.
**No. 08-10914.**

Feb. 22, 2010.

**Background:** State prisoner brought § 1983 action against corrections officer, alleging officer used excessive force against prisoner, in violation of Eighth Amendment prohibition of cruel and unusual punishment. The United States District Court Western District of North Carolina, Graham C. Mullen, J., 2008 WL 1782372, dismissed the action for failure to state a claim, and later denied prisoner's motion for reconsideration and for leave to file an amended complaint, 2008 WL 4005668. Prisoner appealed. The United States Court of Appeals for the Fourth Circuit, 2009 WL 159409, affirmed.

**Holdings:** Granting certiorari, the Supreme Court held that:
(1) the core judicial inquiry when a prisoner alleges that prison officers used excessive force against the prisoner is not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm, abrogating Norman v. Taylor, 25 F.3d 1259, Riley v. Dorton, 115 F.3d 1159, and Taylor v. McDuffie, 155 F.3d 479, and
(2) prisoner stated a claim under § 1983 for use of excessive force.

Reversed and remanded.

Justice Thomas filed an opinion concurring in the judgment, in which Justice Scalia joined.

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

West Headnotes

**[1] Sentencing and Punishment 350H** ☞ **1548**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1548 k. Use of Force. Most Cited Cases
The use of excessive physical force against a prisoner may constitute cruel and unusual punishment even when the inmate does not suffer serious injury. U.S.C.A. Const.Amend. 8.

**[2] Sentencing and Punishment 350H** ☞ **1548**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1548 k. Use of Force. Most Cited Cases
The core judicial inquiry when a prisoner alleges that prison officers used excessive force against the prisoner, in violation of the Eighth Amendment prohibition of cruel and unusual punishment, is not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm; abrogating Norman v. Taylor, 25 F.3d 1259, Riley v. Dorton, 115 F.3d 1159, and Taylor v. McDuffie, 155 F.3d 479. U.S.C.A. Const.Amend. 8.

**[3] Sentencing and Punishment 350H** ☞ **1548**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1548 k. Use of Force. Most Cited Cases
The absence of serious injury is not irrelevant to the inquiry regarding whether the force used against a prisoner was excessive force, in violation of the Eighth Amendment

--- S.Ct. ----, 2010 WL 596513 (U.S.)
(Cite as: 2010 WL 596513 (U.S.))

prohibition of cruel and unusual punishment, because the extent of injury suffered is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation, and the extent of injury may also provide some indication of the amount of force applied. U.S.C.A. Const.Amend. 8.

**[4]** Sentencing and Punishment 350H ☞ 1548

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
       350Hk1548 k. Use of Force. Most Cited Cases
Not every malevolent touch by a prison guard gives rise to a federal cause of action for excessive force in violation of the Eighth Amendment prohibition of cruel and unusual punishment. U.S.C.A. Const.Amend. 8.

**[5]** Sentencing and Punishment 350H ☞ 1548

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
       350Hk1548 k. Use of Force. Most Cited Cases
The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind. U.S.C.A. Const.Amend. 8.

**[6]** Sentencing and Punishment 350H ☞ 1548

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
       350Hk1548 k. Use of Force. Most Cited Cases
An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim under the Eighth Amendment, which prohibits cruel and unusual punishment. U.S.C.A. Const.Amend. 8.

**[7]** Prisons 310 ☞ 124

310 Prisons
   310II Prisoners and Inmates
     310II(B) Care, Custody, Confinement, and Control
       310k124 k. Use of Force. Most Cited Cases

Sentencing and Punishment 350H ☞ 1548

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
       350Hk1548 k. Use of Force. Most Cited Cases
State prisoner's allegations that corrections officer punched, kicked, kneed, choked, and body slammed him maliciously and sadistically and without any provocation, leaving him with a bruised heel, back pain, and other injuries requiring medical treatment, stated a claim under § 1983 for use of excessive force, in violation of Eighth Amendment prohibition of cruel and unusual punishment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

PER CURIAM.

**\*1[1]** In *Hudson v. McMillian,* 503 U.S. 1, 4, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), this Court held that "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." In this case, the District Court dismissed a prisoner's excessive force claim based entirely on its determination that his injuries were "*de minimis.*" Because the District Court's approach, affirmed on appeal, is at odds with *Hudson's* direction to decide excessive force claims based on the nature of the force rather than the extent of the injury, the petition for certiorari is granted, and the judgment is reversed.

I

In March 2008, petitioner Jamey Wilkins, a North Carolina state prisoner, filed suit in the United States District Court for the Western District of North Carolina

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 596513 (U.S.)
(Cite as: 2010 WL 596513 (U.S.))

pursuant to 42 U.S.C. § 1983. Wilkins' *pro se* complaint alleged that, on June 13, 2007, he was "maliciously and sadistically" assaulted "[w]ithout any provocation" by a corrections officer, respondent Gaddy.[FN1] App. to Pet. for Cert. C-4. According to the complaint, Gaddy, apparently angered by Wilkins' request for a grievance form, "snatched [Wilkins] off the ground and slammed him onto the concrete floor." *Ibid*. Gaddy "then proceeded to punch, kick, knee and choke [Wilkins] until another officer had to physically remove him from [Wilkins]." *Ibid*. Wilkins further alleged that, "[a]s a result of the excessive force used by [Gaddy], [he] sustained multiple physical injuries including a bruised heel, lower back pain, increased blood pressure, as well as migraine headaches and dizziness" and "psychological trauma and mental anguish including depression, panic attacks and nightmares of the assault." *Ibid*.

FN1. The materials in the record do not disclose Gaddy's full name.

The District Court, on its own motion and without a response from Gaddy, dismissed Wilkins' complaint for failure to state a claim. Citing Circuit precedent, the court stated that, "[i]n order to state an excessive force claim under the Eighth Amendment, a plaintiff must establish that he received more than a *de minimus[sic]* injury." No. 3:08-cv-00138 (WD NC, Apr. 16, 2008), pp. 1, 2 (citing *Taylor v. McDuffie,* 155 F.3d 479, 483 (C.A.4 1998); *Riley v. Dorton,* 115 F.3d 1159, 1166 (C.A.4 1997) (en banc); footnote omitted). According to the court, Wilkins' alleged injuries were no more severe than those deemed *de minimis* in the Circuit's *Taylor* and *Riley* decisions. Indeed, the court noted, Wilkins nowhere asserted that his injuries had required medical attention.

In a motion for reconsideration, Wilkins stated that he was unaware that the failure to allege medical treatment might prejudice his claim. He asserted that he had been prescribed, and continued to take, medication for his headaches and back pain, as well as for depression. And he attached medical records purporting to corroborate his injuries and course of treatment.

*2 Describing reconsideration as "an extraordinary

remedy," the court declined to revisit its previous ruling. No. 3:08-cv-00138 (WD NC, Aug. 25, 2008), p. 1. The medical records, the court observed, indicated that some of Wilkins' alleged injuries "were pre-existing conditions." *Id.,* at 3. Wilkins had sought treatment for high blood pressure and mental health issues even before the assault. The court acknowledged that Wilkins received an X ray after the incident "to examine his 'bruised heel,' " but it "note[d] that bruising is generally considered a *de minimus[sic]* injury." *Id.,* at 4. The court similarly characterized as *de minimis* Wilkins' complaints of back pain and headaches. The court denied Wilkins leave to amend his complaint. In a summary disposition, the Court of Appeals affirmed "for the reasons stated by the district court." No. 08-7881 (CA4, Jan. 23, 2009).

II

In requiring what amounts to a showing of significant injury in order to state an excessive force claim, the Fourth Circuit has strayed from the clear holding of this Court in *Hudson.* Like Wilkins, the prisoner in *Hudson* filed suit under § 1983 alleging that corrections officers had used excessive force in violation of the Eighth Amendment. Evidence indicated that the officers had punched Hudson in the mouth, eyes, chest, and stomach without justification, resulting in "minor bruises and swelling of his face, mouth, and lip" as well as loosened teeth and a cracked partial dental plate. 503 U.S. at 4, 112 S.Ct. 995. A Magistrate Judge entered judgment in Hudson's favor, but the Court of Appeals for the Fifth Circuit reversed, holding that an inmate must prove "a significant injury" in order to state an excessive force claim. *Hudson v. McMillian,* 929 F.2d 1014, 1015 (1990)*(per curiam)*. According to the Court of Appeals, Hudson's injuries, which had not required medical attention, were too "minor" to warrant relief. *Ibid.*

[2] Reversing the Court of Appeals, this Court rejected the notion that "significant injury" is a threshold requirement for stating an excessive force claim. The "core judicial inquiry," we held, was not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 7, 112 S.Ct. 995; see also *Whitley v. Albers,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 596513 (U.S.)
(Cite as: 2010 WL 596513 (U.S.))

475 U.S. 312, 319-321, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated ... whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." Hudson, 503 U.S. at 9, 112 S.Ct. 995; see also id., at 13-14, 112 S.Ct. 995 (Blackmun, J., concurring in judgment) ("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks").

[3][4][5][6] This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry. Id. at 7, 112 S.Ct. 995. "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Ibid.(quoting Whitley, 475 U.S. at 321, 106 S.Ct. 1078). The extent of injury may also provide some indication of the amount of force applied. As we stated in Hudson, not "every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9, 112 S.Ct. 995. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Ibid. (some internal quotation marks omitted). An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. Ibid. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973)).

*3 Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury. Accordingly, the Court concluded in Hudson that the supposedly "minor" nature of the injuries "provide[d] no basis for dismissal of [Hudson's] § 1983 claim" because "the blows directed at Hudson, which caused bruises, swelling, loosened teeth, and a cracked dental plate, are not de minimis for Eighth Amendment purposes." 503 U.S. at 10, 112 S.Ct. 995.

[7] The allegations made by Wilkins in this case are quite similar to the facts in Hudson, and the District Court's analysis closely resembles the approach Hudson disavowed. Wilkins alleged that he was punched, kicked, kneed, choked, and body slammed "maliciously and sadistically" and "[w]ithout any provocation." Dismissing Wilkins' action sua sponte, the District Court did not hold that this purported assault, which allegedly left Wilkins with a bruised heel, back pain, and other injuries requiring medical treatment, involved de minimis force. Instead, the court concluded that Wilkins had failed to state a claim because "he simply has not alleged that he suffered anything more than de minimus [sic] injury." No. 3:08-cv-00138 (WD NC, Apr. 16, 2008), at 2.

In giving decisive weight to the purportedly de minimis nature of Wilkins' injuries, the District Court relied on two Fourth Circuit cases. See Riley, 115 F.3d, at 1166-1168;Taylor, 155 F.3d, at 483-485. Those cases, in turn, were based upon the Fourth Circuit's earlier decision in Norman v. Taylor, 25 F.3d 1259 (1994) (en banc), which approved the practice of using injury as a proxy for force. According to the Fourth Circuit, Hudson"does not foreclose and indeed is consistent with [the] view ... that, absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injuries are de minimis." 25 F.3d at 1263.

The Fourth Circuit's strained reading of Hudson is not defensible. This Court's decision did not, as the Fourth Circuit would have it, merely serve to lower the injury threshold for excessive force claims from "significant" to "non-de minimis"-whatever those ill-defined terms might mean. Instead, the Court aimed to shift the "core judicial inquiry" from the extent of the injury to the nature of the force-specifically, whether it was nontrivial and "was applied ... maliciously and sadistically to cause harm." 503 U.S. at 7, 112 S.Ct. 995. To conclude, as the District Court did here, that the absence of "some arbitrary quantity of injury" requires automatic dismissal of an excessive force claim improperly bypasses this core inquiry. Id. at 9, 112 S.Ct. 995.[FN2]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 596513 (U.S.)
(Cite as: 2010 WL 596513 (U.S.))

FN2. Most Circuits to consider the issue have rejected the Fourth Circuit's *de minimis* injury requirement. See, *e.g.,Wright v. Goord,* 554 F.3d 255, 269-270 (C.A.2 2009) ("[O]ur Court has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight.... [T]he absence of any significant injury to [the plaintiff] does not end the Eighth Amendment inquiry, for our standards of decency are violated even in the absence of such injury if the defendant's use of force was malicious or sadistic"); *Smith v. Mensinger,* 293 F.3d 641, 648-649 (3d Cir.2002) ("[T]he Eighth Amendment analysis must be driven by the extent of the force and the circumstances in which it is applied; not by the resulting injuries. ... *[D]e minimis* injuries do not necessarily establish *de minimis force* "); *Oliver v. Keller,* 289 F.3d 623, 628 (9th Cir.2002) (rejecting the view "that to support an Eighth Amendment excessive force claim a prisoner must have suffered from the excessive force a more than *de minimis* physical injury" (internal quotation marks omitted)); *United States v. LaVallee,* 439 F.3d 670, 687 (10th Cir.2006) (same).

The Fifth Circuit has sometimes used language indicating agreement with the Fourth Circuit's approach. See, *e.g.,Gomez v. Chandler,* 163 F.3d 921, 924 (1999) ("[T]o support an Eighth Amendment excessive force claim a prisoner must have suffered from the excessive force a more than *de minimis* injury"). But see *Brown v. Lippard,* 472 F.3d 384, 386 (2006) ("This Court has never directly held that injuries must reach beyond some arbitrary threshold to satisfy an excessive force claim"). Even in the Fifth Circuit, however, Wilkins likely would have survived dismissal for failure to state a claim because that court's precedents have classified the sort of injuries alleged here as non-*de minimis*. See, *e.g.,ibid.* (permitting a prisoner's Eighth Amendment excessive force claim to proceed to trial where evidence indicated that the prisoner suffered

"one-centimeter abrasions on both his left knee and left shoulder, pain in his right knee, and tenderness around his left thumb," as well as "back problems"); *Gomez,* 163 F.3d, at 922 (refusing to grant summary judgment on *de minimis* injury grounds where the prisoner alleged "physical pain [and] bodily injuries in the form of cuts, scrapes, [and] contusions to the face, head, and body").

**\*4** In holding that the District Court erred in dismissing Wilkins' complaint based on the supposedly *de minimis* nature of his injuries, we express no view on the underlying merits of his excessive force claim. In order to prevail, Wilkins will ultimately have to prove not only that the assault actually occurred but also that it was carried out "maliciously and sadistically" rather than as part of "a good-faith effort to maintain or restore discipline." *Ibid.* Moreover, even if Wilkins succeeds, the relatively modest nature of his alleged injuries will no doubt limit the damages he may recover.

3

The petition for certiorari and the motion for leave to proceed *in forma pauperis* are granted. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice THOMAS, with whom Justice Scalia joins, concurring in the judgment.

I agree with the Court that the Fourth Circuit's Eighth Amendment analysis is inconsistent with *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). But I continue to believe that *Hudson* was wrongly decided. *Erickson v. Pardus,* 551 U.S. 89, 95, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (dissenting opinion); *Farmer v. Brennan,* 511 U.S. 825, 858, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (opinion concurring in judgment); *Helling v. McKinney,* 509 U.S. 25, 37, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (dissenting opinion); *Hudson,supra,* at 17, 112 S.Ct. 995 (dissenting opinion).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 596513 (U.S.)
(Cite as: 2010 WL 596513 (U.S.))

"At the time the Eighth Amendment was ratified, the word 'punishment' referred to the penalty imposed for the commission of a crime." *Helling,supra,* at 38, 113 S.Ct. 2475 (THOMAS, J., dissenting). The Court adhered to this understanding until 1976, when it declared in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251, that the Cruel and Unusual Punishments Clause also extends to prison conditions not imposed as part of a criminal sentence. See generally *Hudson,supra,* at 18-20, 112 S.Ct. 995 (THOMAS, J., dissenting); *Farmer,supra,* at 861, 114 S.Ct. 1970 (THOMAS, J., concurring in judgment). To limit this abrupt expansion of the Clause, the Court specified that its new interpretation of the Eighth Amendment should not extend to every deprivation a prisoner suffers, but instead should apply "*only* [to] that narrow class of deprivations involving 'serious' injury inflicted by prison officials acting with a culpable state of mind." *Hudson,supra,* at 20, 112 S.Ct. 995 (THOMAS, J., dissenting) (citing *Estelle,supra,* at 106, 97 S.Ct. 285); see generally *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

*Hudson,* however, discarded the requirement of serious injury. Building upon *Estelle's* mislaid foundation, the Court concluded that force, rather than injury, is the relevant inquiry, and that a prisoner who alleges excessive force at the hands of prison officials and suffers nothing more than *de minimis* injury can state a claim under the Eighth Amendment. *Hudson* thus turned the Eighth Amendment into "a National Code of Prison Regulation," 503 U.S. at 28, 112 S.Ct. 995 (THOMAS, J., dissenting); *Farmer,* 511 U.S. at 859, 114 S.Ct. 1970 (THOMAS, J., concurring in judgment), with "federal judges [acting as] superintendents of prison conditions nationwide," *id.,* at 860, 114 S.Ct. 1970. Although neither the Constitution nor our precedents require this result, no party to this case asks us to overrule *Hudson.* Accordingly, I concur in the Court's judgment.

U.S.,2010.
Wilkins v. Gaddy
--- S.Ct. ----, 2010 WL 596513 (U.S.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31654960 (S.D.N.Y.)
(Cite as: 2002 WL 31654960 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Joseph CUNNINGHAM, Jr., Plaintiff,
v.
Sgt. RODRIGUEZ, Defendant.
**No. 01 Civ. 1123(DC).**

Nov. 22, 2002.

Pretrial detainee sued court official, alleging use of excessive force in subduing him after he began yelling obscenities at judge, Official moved for summary judgment. The District Court, Chin, J., held that excessive force was not used.

Judgment for official.

See, also, 2001 WL 1313518.

West Headnotes

**Constitutional Law 92 🗝️   4545(3)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)3 Law Enforcement
                92k4543 Custody and Confinement of Suspects; Pretrial Detention
                    92k4545 Conditions
                        92k4545(3) k. Safety and Security.
Most Cited Cases
    (Formerly 92k262)

**Courts 106 🗝️   55**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(B) Court Officers
            106k55 k. Ministerial Officers in General. Most Cited Cases
Court official did not use excessive force in subduing pretrial detainee, in violation of his due process rights, when he followed standard procedure in wrestling detainee to ground and handcuffing him, after detainee began yelling obscenities at judge and refused to quiet down, and post-incident examination by medic revealed no injuries beyond sore muscles. U.S.C.A. Const.Amend. 14.
Joseph Cunningham, Jr., Bronx, New York, Plaintiff, pro se.

Eliot Spitzer, Attorney General of the State of New York, By: Charles F. Sanders, Assistant Attorney General, New York, New York, for Defendant.

*MEMORANDUM DECISION*

CHIN, J.

**\*1** Pro se plaintiff Joseph Cunningham, Jr. brings this action pursuant to 42 U.S.C. § 1983 against Sgt. Joseph Rodriguez, a New York State court officer. Plaintiff alleges that, on December 23, 1998, defendant deprived him of his constitutional rights by subjecting him to excessive force in a courtroom in the Supreme Court of the State of New York, Bronx County.

Rodriguez moves for summary judgment under Fed.R.Civ.P. 56 on the grounds that (1) plaintiff has failed to establish a constitutional violation as a matter of law, and (2) Rodriguez is entitled to the defense of qualified immunity. For the reasons set forth below, the motion is granted.

*BACKGROUND*

A. *Facts*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31654960 (S.D.N.Y.)
(Cite as: 2002 WL 31654960 (S.D.N.Y.))

Construed in the light most favorable to the plaintiff, the facts are as follows:

On December 23, 1998, plaintiff appeared as a pretrial detainee in criminal proceedings in Bronx County. Plaintiff rejected a plea offer and wanted to proceed to trial. He accused Judge Fisch, who was presiding over the matter, of being biased and alleged that Judge Fisch and the Assistant District Attorney (the "ADA") "manufactured ... a bogus case" against him. (Compl. at 7-8). Plaintiff wanted to make a motion for Judge Fisch to recuse himself. Plaintiff's defense attorney informed him that he could not join in the motion because he knew of no basis for recusal. (Hardy Aff. ¶ 6; Dec. 23, 1998 Tr. at 3-4). Plaintiff then moved *pro se* for Judge Fisch to recuse himself, and the motion was denied. The following colloquy ensued:

THE COURT: No. I will not entertain any other motions that are-.

MR. CUNNINGHAM: No, sir. Sir, listen. Sir-.

THE COURT: Excuse me. I'm talking.

MR. CUNNINGHAM: Sir-.

THE COURT: Don't interrupt me.

MR. CUNNINGHAM: Sir-.

THE COURT: Don't interrupt me.

MR. CUNNINGHAM: This is ridiculous. This is a railroad. This is a railroad. This is a railroad. Get off of me. Get off of me. Get the fuck off of me, man. What are you shaking your head at? This is incredible what you're doing. This is my life and family. You know nothing about the case. Nothing about it. You accuse me of something in this case, sir. You think this thing is a joke, D.A.? You think something is a joke? It's not a joke, man. This woman appears before you and says this. You don't even know the facts. This is what you want. This is justice. You don't know a fucking thing. Get off of me you mother fucker.

(Dec. 23, 1998 Tr. at 5-6). As plaintiff explained at his deposition, he believed that he had "every right under the First Amendment to say what [he] needed to say and [Judge Fisch] needed to listen." (Cunningham Dep. at 62). According to plaintiff, Judge Fisch "gave the court officers a Masonic signal to attack." (Compl. at 10; Cunningham Dep. at 57-58).

A court officer placed his hand on plaintiff to request that he step away from counsel's table and place his hands behind his back to be escorted from the courtroom. (Hardy Aff. ¶ 16). Plaintiff refused to cooperate and resisted the court officers. (Hardy Aff. ¶ 17). According to plaintiff, when he was speaking to Judge Fisch, seven court officers, including Rodriguez, "attacked" him, "[p]ushed [him] to the ground and ... bruised [him] up pretty bad ." (Compl. at 10-11; Cunningham Dep. at 64-65). Rodriguez "was hitting [him] in the back and face." (Compl. at 10).

*2 Plaintiff was handcuffed and escorted to the holding area, where New York City Fire Department Emergency Medical Technicians arrived and examined him. (Lopez Aff. ¶ 23; Rodriguez Aff. ¶¶ 33, 39). Plaintiff told the EMT, "I'm okay," and denied having any pain. (Rivera Aff. ¶¶ 17-18; Def. Ex. G, Ambulance Call Report, Dec. 23, 1998 ("ACR")). Later in the examination, plaintiff complained of minor pain to his wrist, lower lip, and general abdomen area. (Rivera Aff. ¶ 20; ACR at Comments). The EMT found no signs of any trauma, respiratory distress, or bleeding. (Rivera Aff. ¶ 22; ACR at Presenting Problems, 10, 21). The EMT asked plaintiff if he wanted to seek medical attention at an outside facility. Plaintiff refused any further medical attention purportedly because he was "too scared" and he "elected to take [his] chances [when he] got to Rikers Island clinic." (Compl. at 11-12).

On December 30, 1998, plaintiff was seen by medical staff at Rikers Island Correctional Facility ("Rikers Island"),

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31654960 (S.D.N.Y.)
(Cite as: 2002 WL 31654960 (S.D.N.Y.))

and complained of neck, shoulder, lower back, and hip pain. The medical report stated "no significant finding at this time" other than "muscle pain." (Def. Ex. H, Rikers Island Health Record, Dec. 30, 1998 ("RIHR")). Plaintiff was further advised "to return to clinic if symptoms worsen or continue." (RIHR; Cunningham Dep. at 42-43). Plaintiff has not sought further medical treatment for any injuries or pain resulting from the December 23, 1998 incident. (Cunningham Dep. at 46-49).

B. *Procedural History*

Plaintiff filed his *prose* complaint on February 14, 2001, alleging that he was deprived of his constitutional rights under the Eighth and Fourteenth Amendments. Plaintiff seeks $5,000,000 in damages pursuant to 42 U.S.C. § 1983.

In his complaint, plaintiff asserted claims against Judge Fisch, the ADA, his former criminal defense attorney (Michael Hardy), and one named and six unidentified court officers, alleging that defendants deprived him of his constitutional rights during proceedings in open court and in the judge's chambers.

The judge, the ADA, and the defense attorney moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the complaint for failure to state a claim. I dismissed all claims except those asserted against Rodriguez, the named court officer, and the six unidentified officers. *Cunningham v. Fisch,* No. 01 Civ. 1123(DC), 2001 U.S. Dist. LEXIS 17483 (S.D.N.Y. Oct. 26, 2001). By order dated March 11, 2002, I denied plaintiff's motion for leave to substitute the named court officers for the John Doe defendants because the proposed amendment was barred by the applicable statute of limitations and did not satisfy the requirements of Fed.R.Civ.P. 15(c). *Cunningham v. Fisch,* No. 01 Civ. 1123(DC), 2002 U.S. Dist. LEXIS 4005 (S.D.N.Y. Mar. 11, 2002). Thus, the only remaining claims are against Rodriguez. The parties thereafter completed discovery.

This motion followed.

*DISCUSSION*

I. *Applicable Law*

A. *Summary Judgment Standard*

**\*3** Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but [to] determine whether there is a genuine issue for trial." *Anderson v.. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248;see*Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991). A factual issue is genuine if it can reasonably be resolved in favor of either party. *Anderson,* 477 U.S. at 250. A fact is material if it can affect the outcome of the action based on the governing law. *Id.* at 248.

The party seeking summary judgment must demonstrate the absence of genuine issues of material fact, and then the nonmoving party must set forth facts proving that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 321-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat a motion for summary judgment, the nonmoving party must do more than raise "some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586;*Gonzalez v. Rite Aid of N.Y., Inc.,* 199 F.Supp.2d 122, 129 (S.D.N.Y.2002). Rather, the nonmoving party must present significant probative evidence tending to support the complaint. *First Nat'l Bank of Ariz. v. Cities Servs. Co.,* 391 U.S. 253, 289-290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). There is no issue for trial unless there exists sufficient evidence favoring the nonmoving party to support a jury verdict for that party. *Anderson,* 477 U.S. at 249-50. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31654960 (S.D.N.Y.)
(Cite as: 2002 WL 31654960 (S.D.N.Y.))

Where a pro se litigant is involved, "the court has an obligation to read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments they suggest." *Thomas v. Keane,* No. 99 Civ. 4302(DC), 2001 U.S. Dist. LEXIS 4873, at *8 (S.D.N.Y. Apr. 18, 2001) (citation omitted); *see Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (citing *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). "[B]ald assertions," however, cannot overcome a motion for summary judgment, even if the opposing party is pro se. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1995); *Vondette v. McDonald,* No. 00 Civ. 6874(DC), 2001 U.S. Dist. LEXIS 19953, at *8 (S.D.N.Y. Dec. 5, 2001). The plaintiff must provide the Court with "some basis to believe that his version of relevant events is not fanciful." *Yearwood v. LoPiccolo,* No. 95 Civ. 2544(DC), 1998 U.S. Dist. LEXIS 12302, at *7 (S.D.N.Y. Aug. 10, 1998) (quoting *Christian Dior-New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 38 (2d Cir.1986)).

B. *Section 1983*

*4 To state a § 1983 claim, a plaintiff must allege that defendant, while acting "under color of state law," deprived plaintiff of his constitutional or statutory rights. *Am. Mfrs. Ins. Co. v. Sullivan,* 526 U.S. 40, 49-50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); *see* 42 U.S.C. § 1983. To be liable under § 1983, the defendant must have been personally involved in the alleged violation. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Morris v. Eversley,* 205 F.Supp.2d 234, 241 (S.D.N.Y.2002).

A pretrial detainee who is subjected to excessive force may bring a claim under § 1983. While the Eighth Amendment's protection from cruel and unusual punishment does not apply "until after conviction and sentence," *Graham v. Connor,* 490 U.S. 386, 392 n. 6, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the right of a pretrial detainee to be free from excessive force amounting to punishment is protected by the Due Process Clause. *United States v. Walsh,* 194 F.3d 37, 47 (2d Cir.1999) (citing *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Accordingly, the *Hudson* analysis that requires an inmate to satisfy both an objective and a subjective prong to establish an Eighth Amendment violation also applies to excessive force claims brought by a pretrial detainee. *Walsh,* 194 F.3d at 48 (citing *Hudson*

*v. McMillian,* 503 U.S. 1, 7-8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)).

First, the plaintiff must show that the alleged use of force is "objectively sufficiently serious or harmful enough" to be actionable. *Walsh,* 194 F.3d at 50 (citing *Hudson,* 503 U.S. at 8). A claim of excessive force may be established even if the victim does not suffer serious or significant injury, if plaintiff can demonstrate that the amount of force used is more than *de minimis,* or, otherwise involves force "repugnant to the conscience of mankind." *Walsh,* 194 F.3d at 47 (citing *Hudson,* 503 U.S. at 9-10). The Second Circuit has held that not "every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

Second, the subjective requirement is satisfied if the defendant acted wantonly with a "sufficiently culpable state of mind." *Walsh,* 194 F.3d at 49-50 (citing *Hudson,* 503 U.S. at 8); *see also Sims v. Artuz,* 230 F.3d 14 (2d Cir.2000). Where a state official is accused of using excessive physical force against a pretrial detainee, the inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Walsh,* 194 F.3d at 48-49.

II. *Application*

At the time of the incident, Rodriguez was a court officer at the Bronx County Courthouse. As a peace officer, Rodriguez was authorized to use physical force to prevent disruption in the courtroom. N.Y.Crim. Proc. Law §§ 1.20(33), 2.10(21)(a) (McKinney 2002); N.Y. Penal Law § 35.30 (McKinney 1999). Thus, there is no dispute that Rodriguez acted under color of state law.

*5 Even construing the facts in the light most favorable to the plaintiff, however, I conclude that plaintiff cannot establish that Rodriguez violated his constitutional rights. As a matter of law, plaintiff is unable to satisfy either the objective or subjective prong of the *Hudson* excessive force test.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31654960 (S.D.N.Y.)
(Cite as: 2002 WL 31654960 (S.D.N.Y.))

A. *Objective Element of the Hudson Test*

1. *The Force Applied Was De Minimis*

Plaintiff alleges that Rodriguez hit him in the back and face. The medical records of examinations performed on plaintiff in the aftermath of the incident show that any force used by Rodriguez was *deminimis.* The EMT who examined plaintiff in the courthouse after the incident found that plaintiff had "no injuries or complaints." Moreover, plaintiff refused any further medical assistance and chose not to go to an outside hospital, claiming he was "too scared." On December 30, 1998, a week after the incident, plaintiff was examined by medical personnel at Rikers Island. The medical record indicates that plaintiff complained of neck, shoulder, lower back, and hip pain, but the doctor found nothing significant aside from muscle pain. Although plaintiff was advised to return to the clinic if his symptoms were to worsen or continue, he sought no further medical treatment. Thus, I conclude that the record indicates, as a matter of law, that the force used was *deminimis.*[FN1] Plaintiff has pointed to no evidence that shows otherwise.

> FN1.Compare*Hudson v. McMillian,* 503 U.S. at 10 ("bruises, swelling, loosened teeth, and a cracked dental plate are not *deminimis"* ), *with*Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir.1997) (bumping, grabbing, elbowing, and pushing plaintiff was *deminimis* ); *Espinal v. Goord,* No. 00 Civ. 2242(AJP), 2001 U.S. Dist. LEXIS 5688 at *53 n. 46 (S.D.N.Y. May 7, 2001) (injuries held to be *deminimis* where plaintiff was hit in the face two or three times, requiring summary judgment); *Bove v. New York City,* No. 98 Civ. 8800, 1999 U.S. Dist. LEXIS 12112, at *6 (S.D.N.Y. Aug. 6, 1999) (summary judgment where only injury supported by evidence was single bruise to head); *Taylor v. McDuffie,* 155 F.3d 479, 483 (4th Cir.1998) (pretrial detainee's injuries held *deminimis* where medical records do not support plaintiff's purported injuries), *cert.denied,*525 U.S. 1181, 119 S.Ct. 1121, 143 L.Ed.2d 115 (1999).

2. *The Force Applied Was Not Repugnant to the Conscience of Mankind*

In addition, the force was clearly not "repugnant to the conscience of mankind." Rodriguez and other court officers wrestled plaintiff to the ground and handcuffed him only after plaintiff directed profanity at the court and resisted the officers' request to leave the courtroom. This authorized use of force to restore order in the courtroom is not what courts have deemed to be "repugnant to the conscience of mankind." [FN2]

> FN2.Compare*Walsh,* 194 F.3d at 50 (a 300 to 400 pound prison guard stepping on inmate's penis was unequivocally contrary to "contemporary standards of decency" and "repugnant to the conscience of mankind"), *with*B a r r a t t   v .   J o i e ,   N o .   9 6   C i v . 0324(LTS)(THK), 2002 U.S. Dist. LEXIS 3452, at *34-35 (S.D.N.Y. Mar. 4, 2002) (a single kick, unaccompanied by any competent evidence of significant injury, is not repugnant); *Santiago v. C.O. Campisi Shield # 4592,* 91 F.Supp.2d 665, 674 (S.D.N.Y.2000) (an open-handed slap in the face not repugnant); *Yearwood v. LoPiccolo,* 1998 U.S. Dist. LEXIS 12302, at *7 (allegations that plaintiff was choked, hit in the head with a pair of keys, and punched him in the lip were not substantiated by medical records, and not repugnant, requiring summary judgment).

As indicated by the medical records, plaintiff suffered no serious or significant injuries. Moreover, Rodriguez used *deminimis* force not "repugnant to the conscience of mankind" to restore order following plaintiff's disruption. Thus, plaintiff has failed to meet the objective prong of the *Hudson* test.

B. *Subjective Element of the Hudson Test*

Even if plaintiff could satisfy the objective prong of the *Hudson* test, no reasonable jury could find on this record that Rodriguez acted wantonly with a sufficiently culpable state of mind.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31654960 (S.D.N.Y.)
(Cite as: 2002 WL 31654960 (S.D.N.Y.))

On December 23, 1998, plaintiff appeared as a defendant in a criminal proceeding. Plaintiff asserted that Judge Fisch was biased against him. The court allowed plaintiff an opportunity to state his oral application for its recusal, and then denied the application. Plaintiff failed to adhere to the court's direction to be quiet. Plaintiff refused to follow a judicial order because of his assertion that he had a constitutional right to speak, and used profanity directed at the court. Moreover, he refused to comply with a court officer's order to step back and place his hands behind his back. He resisted the officers. Hence, they were required to subdue him and to escort him out of the courtroom.

**\*6** In these circumstances, it is evident that the use of force was not wanton or malicious, but an authorized and good faith effort to restore discipline and to gain control of a criminal defendant disrupting courtroom proceedings. Thus, Rodriguez lacked the requisite culpability under the subjective prong of the *Hudson* excessive force test to subject him to constitutional liability. Again, plaintiff has failed to present evidence from which a reasonable jury could find otherwise.

*CONCLUSION*

Plaintiff is unable, as a matter of law, to meet the objective and subjective prongs of the *Hudson* excessive force test.FN3 Therefore, the complaint must be dismissed. For the reasons set forth above, defendant's motion for summary judgment is granted. The claims against defendant Rodriguez are dismissed with prejudice. The Clerk of the Court shall enter judgment accordingly. This case shall be closed.

> FN3. As I conclude that plaintiff's excessive force claims must be dismissed for failure to meet the elements of the *Hudson* test, I will not address the issue of defendant's qualified immunity defense.

SO ORDERED.

S.D.N.Y.,2002.
Cunningham v. Rodriguez

Not Reported in F.Supp.2d, 2002 WL 31654960 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Frank G. MOWRY, Plaintiff(s),
v.
Robert F. NOONE, In his Individual and Official
Capacity and Douglas Dickenson, Individually and in
his Official Capacity as an employee/agent of the
County of Seneca, Defendant(s).
No. 02-CV-6257FE.

Sept. 30, 2004.

Frank G. Mowry, Gowanda, NY, pro se.

Thomas J. Lynch, Esq., Law Offices of Thomas J. Lynch,
Syracuse, NY, Thomas Desimon, Esq., Harris Beach LLP,
Pittsford, NY, for Defendants.

DECISION AND ORDER

*Preliminary Statement*

FELDMAN, Magistrate J.

**\*1** Plaintiff Frank G. Mowry ("Mowry" or "plaintiff"),
proceeding *prose,* brings this action pursuant to 42 U.S.C.
§ 1983. Plaintiff alleges that (1) defendant Robert F.
Noone, Jr. ("Noone") used excessive force to effectuate
his arrest, in violation of his rights under the Fourth
Amendment of the Constitution, (2) defendant Douglas
Dickenson ("Dickenson") failed to intervene to stop
Noone from using excessive force, and (3) both Noone
and Dickenson deliberately denied him medical care in
violation of his rights under the Fourteenth Amendment
of the Constitution. Defendants now move for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure (Docket # 70). In accordance with the
provisions of 28 U.S.C. § 636(c), the parties have
consented to the jurisdiction of this Court for all
dispositive matters, including trial. (Docket # 11). For the
reasons set forth herein, defendants' motion for summary
judgment is granted.

*Factual Background*

Mowry alleges that on July 22, 1999 he was stopped at a
traffic light in the left turn only lane at the Ovid Street
bridge in Seneca Falls, New York. Mowry continued
straight ahead onto Cayuga Street when the light turned
green. Defendant Officer Robert F. Noone, Jr. of the
Seneca Falls Police Department, observed Mowry disobey
the traffic sign, activated the emergency lights on his
vehicle and began following Mowry. (Mowry Dep. Trans.
p. 17, 17-18 FN1). Mowry knew that he was driving
illegally but did not pull over. (Mowry Dep. Trans. p. 18,
12). Noone continued to follow Mowry for several miles.
(Mowry Dep. Trans. p. 20, 8). When Mowry turned onto
Route 318, Deputy Douglas Dickenson of the Seneca
County Sheriff's Department, joined the pursuit and
activated his emergency lights. (Mowry Dep. Trans. p. 22,
5-6, p. 24, 3). Mowry continued driving even though he
knew he was the subject of pursuit. (Mowry Dep. Trans.
p. 25, 7). Mowry lead defendants on a highspeed chase
that reached speeds of over 75 mph and narrowly avoided
several head-on collisions as he attempted to pass vehicles
on the two-lane road. (Mowry Dep. Trans. p. 21, 12-13,
22). Mowry turned onto Birdsey Road and continued
driving until a construction road closure forced him to stop
his car. (Mowry Dep. Trans. p. 28, 9-22).

FN1. Deposition references are to the page and
line number of transcript of the May 27, 2003
deposition of plaintiff Frank. G. Mowry.

Mowry exited his car and when he saw Dickenson,
followed by Noone, turn onto Birdsey Road he began to
flee. (Dep. Trans. p. 38, 9-13; p. 39, 3). Dickenson ran
after Mowry yelling at him to stop. (Mowry Dep. Trans. p.
39, 8). Once Mowry saw that he was about to be overtaken
by Dickenson, he stopped and Dickenson brought him to

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

the ground. (Mowry Dep. Trans. p. 34, 20). Mowry landed with his hands and knees on the gravel. (Mowry Dep. Trans. p. 37, 2; p. 40, 20-21). Dickenson asked Mowry if he was alright, and Mowry responded yes. (Mowry Dep. Trans. p. 42, 15-20).

Dickenson gave Mowry 30 seconds to catch his breath on his hands and knees, then pulled Mowry's right arm behind his back to handcuff him. (Mowry Dep. Trans. p. 42, 12-13, p. 39, 21-22). At the same time, Mowry heard a car door slam and saw Noone running towards them. (Mowry Dep. Trans. p. 72, 19-21). Mowry testified that when he saw Noone running towards them he only had time to turn his head away. (Mowry Dep. Trans. p. 46, 6-8). Mowry testified that Noone was running too fast and overran Mowry and Dickenson. (Mowry Dep. Trans. p. 46, 18-19). As Noone jumped over the top of Mowry's head, the toe of Noone's boot hit the side of Mowry's head. (Mowry Dep. Trans. p. 49, 4-5). Noone landed on one foot before regaining his balance. (Mowry Dep. Trans. p. 48, 21-23). Noone and Dickenson pulled Mowry off the ground and placed him in Noone's car. (Mowry Dep. Trans. p. 49, 13-14). Mowry claims to have lost consciousness until he was placed in the back of the patrol car. (Mowry Dep. Trans. 50, 9-14). Mowry denies telling anyone that he was injured until after he got to the police station and was formally "booked in" at the county jail. (Mowry Dep. Trans. 55, 7-13). Mowry concedes that he did not ask for any medical attention at that time. (Mowry Dep. Trans. 55, 17-22, 68, 10-15).

*2 Mowry was taken to the Seneca Falls Police Station where he was charged with Driving While Intoxicated, Aggravated Unlicensed Operation of a Motor Vehicle in the First Degree, and Reckless Endangerment.[FN2] Within 24 hours of his arrest, Mowry was examined by medical personnel at the county jail and was treated for neck pain. (Mowry Dep. Trans. p. 68, 19; p. 58, 3-4).

> FN2. Mowry later admitted guilt to all three charges. (Mowry Dep. Trans. p. 63, 8-20).

Mowry alleges that he was later diagnosed with a fractured left cheekbone. (Mowry Dep. Trans. p. 65, 5-9). He also asserts that as a result of this injury he experiences blurred vision and migraine headaches. (Mowry Dep. Trans. p. 65,

6-9). According to Mowry, the results of an MRI taken while he was in prison were "normal." (Mowry Dep. Trans. p. 82, 18-19).

*Discussion*

*Summary Judgment Standard:* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it has some affect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Catanazaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998).

The burden of showing the absence of any genuine issue of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a court is confronted with facts that permit different conclusions, all ambiguities and inferences that may reasonably be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). Rule 56(e), however, also provides that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial. Such an issue is not created by a mere allegation in the pleadings [citations omitted], nor by surmise or conjecture on the part of litigants." *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (per curium). "Affidavits submitted in opposition to a motion for summary judgment must set forth such facts as would be admissible in evidence." *Franklin v. Krueger Int'l,* 1997 WL 691424 at *3 (S.D.N.Y. November 5, 1997) (citing *Raskin v. The Wyatt Co.,* 125 F.3d 55 (2d Cir.1997) ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

In addition, *prose* submissions, particularly those alleging civil rights violations, are construed liberally and are treated as raising the strongest arguments that they might

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

suggest. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). See also *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (because plaintiff's "complaint alleges civil rights violations and he proceeded *pro se* in the District Court, we must construe his complaint with particular generosity") (citations omitted).

**\*3** *I. Excessive Force Claim:* The Supreme Court has held that claims against police officers for excessive force must be examined under the Fourth Amendment's reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Determining whether the force used was reasonable requires a balancing of the intrusion on the individual's Fourth Amendment rights against the interests of the government. *Id.* at 396. The reasonableness of a particular use of force must be judged objectively from the perspective of a reasonable officer at the scene of the arrest. *Graham,* 490 U.S. at 397. In evaluating the officer's actions, courts should consider the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. It is well established that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion. *Id.* See *Mickle v. Morin,* 297 F.3d 114, 120 (2nd Cir.2002)(in the context of excessive force used during an arrest, "not every push or shove" is excessive.)(internal citations omitted).

In this case, the record is clear that the officers were faced with an extremely dangerous situation as Mowry drove erratically down narrow roads to avoid capture. Indeed, Mowry's actions repeatedly put the lives of other motorists in imminent danger. Applying the *Graham* balancing test to these circumstances, there is no question that the officers acted appropriately in stopping and arresting Mowry. See *Washington v. City of Riverside Illinois,* 2003 WL 1193347, \*5 (N.D.Ill. March 13, 2003) (summary judgment granted when driver's decision to flee justified officer's subsequent use of force to arrest.). Simply put, Mowry has produced no evidence upon which a reasonable jury could find that the defendants used excessive force during his take down and arrest.

As for Mowry's allegation that Noone applied excessive force by "kicking him in the head," this Court will not credit Mowry's attempt to change his deposition testimony with the affidavit he submits in opposition to defendants' motions. Rather, this Court relies on Mowry's deposition testimony which clearly establishes the accidental nature of any injury caused by Noone. See *Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987)("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."); *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

The undisputed facts here are that after Mowry was taken down by Dickenson, Noone exited his vehicle, ran toward Mowry with such speed that he overran Mowry and Dickenson, and tripped over Mowry. In light of the prolonged chase, the officers had a reasonable basis for believing that Mowry posed a serious threat, especially since he continued to run and evade arrest after he exited his vehicle. Under these circumstances, this Court finds that it was objectively reasonable for Noone to approach Mowry at a high rate of speed in his effort to assist Dickenson in subduing Mowry, and that his actions can not constitute excessive force.

**\*4** *II. Failure to Intervene Claim:* Mowry also makes a claim for failure to intervene. It is well established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994); *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used. *Anderson,* 17 F.3d at 557. In order to be held liable, the law enforcement official must have had a realistic opportunity to intervene in order to prevent the harm from occurring. *Id.* at 557.

Here, based on the facts as presented by Mowry, Dickenson did not have the opportunity to intercede before Noone tripped over Mowry, and therefore cannot be held liable. See *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988) (defendant entitled to judgment where

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

record clear that blows were struck in such a rapid succession that officer "had no realistic opportunity to attempt to prevent them."). At the time the alleged excessive force was used, Dickenson had one hand on Mowry's left arm and was attempting to pull Mowry's right arm behind Mowry's back. Even Mowry stated that when he heard Noone running toward them he only had time to turn his head away before Noone overran them. Moreover, Noone's alleged use of excessive force was a single kick to the head, an event which Mowry concedes happened quickly and without warning. This was not a situation where the alleged excessive force continued for such a period of time that Dickenson, upon realizing what was happening, could have stopped it. *Id.* at 11-12.

Because a reasonable jury could not conclude otherwise, summary judgment should be granted in favor of Dickenson on the failure to intervene claim.

*III. Denial of Medical Treatment:* Mowry's third claim is for denial of medical treatment. The denial of medical treatment for a pre-trial detainee is evaluated under the Due Process Clause of the Fourteenth Amendment. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). Although not specifically defined by the Supreme Court, the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner. *City of Revere,* 463 U.S. at 244; *Weyant v. Okst,* 101 F.3d. at 856.

In *Weyant,* the Second Circuit established a two-part test to determine liability for denial of medical treatment. First, the denial of medical treatment must concern an objectively serious injury. *Weyant,* 101 F.3d at 856. A serious injury has been defined as "one that may produce death, degeneration or extreme pain." *Mills v. Fenger,* 2003 WL 251953, *4 (W.D.N.Y.2003)* (citations omitted). Second, the plaintiff is required to show that based on what the defendant knew or should have known, the defendant acted with deliberate indifference to plaintiff's serious medical needs. *Weyant,* 101 F.3d at 856. Deliberate indifference is established if the defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical condition. *Weyant,* 101 F.3d at 856.

*5 Here, the undisputed facts establish that the defendants did not deny plaintiff medical treatment. Even assuming arguendo that Mowry's injury rose to the level of an objectively serious medical injury, there is no credible evidence in the record to base a finding that either Noone or Dickenson should have been aware of his need for medical treatment, but were indifferent to his needs. Indeed, the record demonstrates that Mowry never told the defendants that he needed medical attention and the injuries he now alleges were not apparent to them. Contrary to plaintiff's claims, Dickenson demonstrated his concern for plaintiff's well-being when he asked Mowry if he was alright and gave him time to catch his breath. Mowry did not ask for medical assistance or complain about his alleged injuries immediately following the arrest. At the county jail, Mowry stated that he did not need medical attention. It was not until the following day that Mowry first requested medical attention. Mowry admits that in response to this request, he was then treated by the medical personnel at the county jail and given a prescription for neck pain.

The record is devoid of credible evidence that either defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical needs. *See Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 338 (E.D.N.Y.2003) (to establish a constitutional violation the facts must give rise to a reasonable inference that defendants *knew* of serious medical needs and intentionally disregarded them.). Based on the record here, summary judgment should be granted in favor of defendants Dickenson and Noone on plaintiff's denial of medical treatment claim.

*Conclusion*

For all the foregoing reasons, defendants' Motions for Summary Judgment (Docket # 67, 70) are granted. Having granted defendants' motion for summary judgment by determining that plaintiff has failed to adduce evidence of a constitutional violation, plaintiff's motions for "dismissal of defendant's (sic) motion" and "cross motion" for summary judgement (Docket # 75) are denied.

SO ORDERED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))


W.D.N.Y.,2004.
Mowry v. Noone
Not Reported in F.Supp.2d, 2004 WL 2202645
(W.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

C Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. SeeFed.R.Civ.P. 72(b), Advisory
Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

> FN1. This matter was referred to the undersigned
> pursuant to 28 U.S.C. § 636(b) and
> N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff
and failed to provide adequate medical treatment for his
injuries and drug problem. Plaintiff seeks declaratory
relief and monetary damages. Presently pending is
defendants' motion to dismiss pursuant to Fed.R.Civ.P.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

> FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not

whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

#### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

#### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl., ¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare* *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and* *Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with* *Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement

claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See* *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference can be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See* *Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain

from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

**REPORT-RECOMMENDATION** [FN1]

> [FN1.] This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

**I. INTRODUCTION**

*1 Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the

matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

> [FN2.] It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

**II. BACKGROUND**

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

> [FN3.] LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

**III. FACTS** [FN4]

> [FN4.] While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. Fed.R.Civ.P. 56(e); *see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).* Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). With this standard in mind, the court

now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id. at 103,*97 S.Ct. at 290 (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at \*4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" ' are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def.* ['s] Ex. A, P. 4) .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def.* ['s] Ex. B, P. 1).

**\*4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

*6 WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

---

**C** Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Corey FORD, Plaintiff,
v.
William E. PHILLIPS, Superintendent of Green Haven
Correctional Facility; Guiney, Deputy Superintendent;
Matthew Miller, Corrections Officer; Franklin W.
Middleton, Corrections Officer; S. Phillip, Corrections
Officer; D. McClenning, Corrections Officer, J. Erns,
Corrections Officer; D. Huttel, Corrections Officer; C.
Austin, Corrections Officer; L. Czyzewski, Corrections
Officer; R. Myers, Sergeant; D. Carey, Sergeant; John
Doe # 1, Corrections Officer; John Doe # 2, Corrections
Officer; Joseph T. Smith, Superintendent of
Shawangunk Correctional Facility; John Maly, Deputy
Superintendent; Bipin Bhavsar, Medical Doctor;
Kimbler, Sergeant; Jewett, Sergeant; Alfred Vacca,
Inspector General, individually and in their official
capacities, Defendants.[FN1]

> [FN1.] This caption reflects the caption in
> plaintiff's Complaint. Defendants did not provide
> the Court with a full, corrected caption.

**No. 05 Civ. 6646(NRB).**

March 27, 2007.

Corey Ford, Walkill, NY, Plaintiff, pro se.

Efthimios Parasidis, Assistant Attorney General, Office of
the Attorney General, State of New York, New York, NY,
for Defendants.

MEMORANDUM AND ORDER

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

BUCHWALD, J.

**\*1** *Pro se* plaintiff Corey Ford ("Ford"), who is currently
incarcerated, brings this action against employees of the
Department of Correctional Services ("DOCS"), pursuant
to 42 U.S.C. § 1983, alleging: (1) excessive force; (2)
denial of recreation, showers, special meals and property;
(3) deliberate indifference to a serious medical need; and
(4) mail interference, all in violation of his constitutional
rights. Ford moved for summary judgment on July 24,
2006 and defendants cross-moved for summary judgment
on December 22, 2006.[FN2] For the reasons stated below,
we deny Ford's motion for summary judgment and grant
defendants' motion for summary judgment in part.

> [FN2.] Although the title of Ford's motion is
> "Motion for Partial Summary Judgment", his
> papers clearly argue for judgment on all of the
> claims raised in his Complaint. Defendants'
> motion for summary judgment expressly applies
> to Ford's entire Complaint.

*BACKGROUND*[FN3]

> [FN3.] Unless otherwise noted, the following facts
> are not in controversy.

A. Ford's Attack on Officer Miller

Plaintiff's Complaint arises from events at the Green
Haven and Shawangunk correctional facilities in April and
May of 2004.[FN4] In the early afternoon of April 14, 2004,
at approximately 12:30 p.m., Ford exited his cell without
permission when a corrections officer unlocked the door
for Ford's cellmate.[FN5] After leaving his cell, Ford headed
directly for Officer Miller, who was writing passes for
inmates.[FN6] As Ford later admitted,[FN7] Ford then threw hot
oil on Officer Miller, burning his face, head, eye, neck,

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

shoulders and chest, and repeatedly stabbed Officer Miller with a homemade shank measuring approximately nine inches in length. As he was attacked by Ford, Officer Miller repeatedly screamed, "Get him off me!" [FN8]

> **FN4.** Plaintiff is currently incarcerated and serving a sentence of twelve and one-half to twenty-five years, having plead guilty to attempted murder, kidnapping and a weapons violation. *See* Declaration of Efthimios Parasidis ("Parasidis Decl."), dated December 22, 2006.

> **FN5.** *See* Parasidis Decl., Ex. B, FORD 42. Earlier that day, Officer McClenning observed Ford yelling from his cell gate and generally being disrespectful. *Id.* at FORD 39.

> **FN6.** *See id.* at FORD 1, 15, 17-18, 27, 34, 40, 42, 44, 66.

> **FN7.** *Id.,* Ex. E., FORD IG 26-29, 290-295.

> **FN8.** *Id.,* Ex B., April 14, 2004 Statement of Officer J. Erns ("I heard officer Miller begin to scream.... I saw Officer Miller being attacked by an inmate and Officer Miller screaming 'Get him off me Get him off me' ").

Officers Phillips, Middleton and Todriff responded to Officer Miller's call, attempting to restrain Ford. [FN9] After slipping in the oil and falling with Ford to the ground, the officers pried the shank out of Ford's hand, placed him in mechanical restraints, stood him up, and faced him against a wall. [FN10] Once the officers had Ford under control, an ambulance rushed Officer Miller to St. Francis Hospital in Poughkeepsie, New York, where he remained over night. [FN11] Officers Todriff and Middleton were also treated at the St. Francis emergency room for injuries sustained while restraining Ford. [FN12] Ford was later convicted by a jury for his assault on Officer Miller and is currently awaiting sentencing. [FN13]

> **FN9.** *Id.*

> **FN10.** *Id.* at FORD 1, 10-12, 16, 27, 29, 42, 77, 80.

> **FN11.** *Id.* at FORD 45-46.

> **FN12.** *Id.* at FORD 1-2, 21-22, 43.

> **FN13.** *See id.,* Ex. F, FORD 130-131. *See also* Supreme & County Courts of the State of New York, Dutchess County, Certificate of Disposition Indictment (certifying that Ford was convicted of one count of first degree attempted assault, two counts of second degree assault, two counts of third degree criminal possession of a weapon, and one count of promoting prison contraband in the first degree).

In his Complaint, Ford provides a somewhat different version of the events of April 14, 2004. Specifically, Ford asserts that Officer Miller denied him recreation, an alternative meal, and showers on April 5, 12, 13 and 14 of 2004 [FN14] and that, on the morning of April 14, 2004, prior to his attack on Officer Miller, Officers Miller, Erns, and McClenning kicked and punched Ford in the face, head, chest and back without provocation. [FN15] Ford further asserts that later, at 12:30 p.m., approximately the time of Ford's assault on Officer Miller, Officers Miller, Erns, Middleton and Phillips used excessive force against him. [FN16]

> **FN14.** Ford Complaint, received June 20, 2005 at the S.D.N.Y. Pro Se Office, at 6. Ford contends that he is entitled to non-meat meals.

> **FN15.** *Id.* (alleging cruel and unusual punishment, harassment, excessive force, deprivation of outside exercise, threats of bodily harm, and other grievances). As discussed *infra,* these claims are contradicted by statements made and signed by Ford shortly after the putative

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

attack.

FN16.*Id.* at 7.

Thus, Ford does not directly challenge the facts provided above, but adds that Officer Miller deprived him of certain entitlements over four days, that Officers Miller, Erns and McClenning used excessive force against him on the morning of April 14, 2004, and that Officers Miller, Erns, Middleton and Phillips used excessive force against him again when he attacked Officer Miller.

B. Ford's Escort to Special Housing

**\*2** After Ford attacked Officer Miller, Officers Huttel, Czyzewski, Myers and Austin escorted Ford to Special Housing (also known as "SHU"). During the escort, defendants contend that plaintiff was combative and uncooperative, kicking Officer Huttel and attempting to kick the other officers.FN17 As is evident from a videotape showing parts of Ford's transfer to Special Housing, Ford fell twice during his escort and was picked up by the officers each time.FN18 Ford claims that he was again the victim of excessive force during this transfer, calling the officers' conduct "unwarrantly malicious sadistic and unprovoked" and alleging that his head was repeatedly rammed into a wall and steel bars, and that he was punched and kicked in the face and back.FN19

FN17. Parasidis Decl., Ex. B, FORD 2, 42, 48, 52, 60-63; Ex. H (videotape of officers escorting Ford to Special Housing).

FN18.*Id.*

FN19. Compl. at 6-10. Apparently quoting the report from his medical examination, Ford asserts that he sustained "extreme and numerous abriasions (sic), with bleeding Lt temple (sic), redenes abriasion (sic) on both right and left sides of plaintiff face. 2 redden abriasions areas (sic) RT upper chest, superficial scratches on RT

upper back" from the April 14 attacks.

C. Ford's Post-Incident Medical Treatment

Upon his arrival at Special Housing, Ford was examined by medical staff, which found him to have a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back.FN20 The staff found no other injuries and the medical records indicate that Ford did not suggest that he had any other injuries at that time.FN21

FN20. Parasidis Decl., Ex. B, FORD 2, 8-9 (April 14, 2004 Physical Examination of Corey Ford), 51-53.

FN21.*See id.*, Ex. C, FORD GRIEVANCE 43-46 (SHU Entrance Exam, stating "Use of force exam done.").

During the next few weeks, Ford received additional medical attention. On the morning of April 16, for instance, Ford was examined by a triage nurse and complained the he was urinating and spitting up blood.FN22 The nurse scheduled an appointment for Ford to meet with a doctor and he was examined by Dr. Bipin Bhavsar that afternoon.FN23 After examining Ford, Dr. Bhavsar ordered a urine analysis FN24 and prescribed Tylenol.FN25 Dr. Bhavsar also treated Ford on April 21, 2004, as Ford again complained of blood in his urine, and ordered a second urine analysis.FN26 Both urine analyses found evidence of blood.FN27

FN22.*Id.*, Ex. B, 47; Ex. D, FORD MEDICAL 26.

FN23.*Id.*

FN24.*Id.*; Ex. G (Bhavsar Decl.) at 1.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN25.*Id.*

FN26.*Id.* at FORD MEDICAL 25; Ex. G at 2.

FN27.*Id.*

On April 29, 2004, medical staff examined Ford because Ford complained of pain in his wrists.[FN28] The staff determined that Ford had "no obvious loss of dexterity."[FN29] The next day, on April 30, 2004, Dr. Bhavsar reexamined Ford, observing that Ford's ribs and abdomen had no tenderness, that his glands were not enlarged, that his abrasions were healed, and that his wrist was not swollen or restricted in movement.[FN30] As Ford still complained of blood in his urine, Dr. Bhavsar ordered a third urine analysis and ordered that x-rays be taken of Ford's hands as a precaution.[FN31] The x-rays were taken on May 3, 2004 and revealed no "fracture, dislocation or arthritic change."[FN32]

FN28.*Id.*

FN29.*Id.*

FN30.*Id.* at FORD MEDICAL 24; Ex. G at 9.

FN31.*Id.* at FORD MEDICAL 37.

FN32.*Id.* at FORD MEDICAL 41.

Finally, since Ford continued to complain of pain and other problems, and since the urine tests persisted in revealing blood at level "3+", Dr. Bhavsar ordered that Ford undergo a CAT-scan of his abdomen and kidneys on May 7, 2004.[FN33] The CAT-scan results were negative.[FN34] In addition to this and the other treatments he received, Ford had daily opportunities for medical assistance from the Special Housing nurse who, in accordance with DOCS

policy, made regular rounds of the entire Special Housing unit.[FN35]

FN33.*Id.* at FORD MEDICAL 22-3, 69; Ex. G at 2.

FN34.*Id.* (Ford's "renal parenchyma and collecting system [were] normal on all series" and there was "no evidence of renal stone, filling defect, or mass lesion". Ford's liver, adrenals, pancreas, spleen and bowels were also found to be "unremarkable". No free fluid or air was detected and, more generally, there was no evidence of any medical abnormality).

FN35.*Id.,* Ex. C, FORD GRIEVANCE 34.

**\*3** Notwithstanding the medical attention he received, Ford contends that he was denied necessary medical treatment during April and May of 2004.[FN36] Specifically, he asserts that he "was denied medical treatment on arrival to [Special Housing]" and, despite numerous complaints made to Sgt. Jewett, Sgt. Kimbler and others that he was in excruciating pain, "never received medical attention".[FN37] Ford claims that, to this day, he suffers from a weak bladder and leaks blood from his penis on occasion.[FN38]

FN36.*See e.g.* Ford' Motion for Partial Summary Judgment, dated July 24, 2006, at 18.

FN37.*Id.*

FN38.*Id.*

D. Post-Incident Restrictions on Ford

Ford was placed under certain restrictions upon his admission to Special Housing. According to defendants, Ford was under a restraint order as a result of his assault

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

on the staff at Green Haven and, accordingly, was not permitted out-of-cell activities.[FN39] As well, Ford was initially denied certain property because of the danger he posed to himself and to others.[FN40] The order restraining Ford remained in effect until May 3, 2004, and the order regarding Special Housing property remained in effect until April 25, 2004.[FN41] Ford was permitted to leave his cell on April 20, 2004 to retrieve his personal property and, according to defendants' affidavits, was permitted out of his cell to shower on a regular basis starting on April 23, 2004.[FN42]

> **FN39.** Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57.

> **FN40.** *Id.*

> **FN41.** *Id.*

> **FN42.** *Id.*

Ford offers a slightly different, if only more specific, version of these restrictions. Ford repeatedly claims that, in violation of his rights, his cell was covered with plexi-glass and he was denied bed sheets, a pillow case, a towel, a wash cloth, soap, toothpaste, a toothbrush, pens and writing paper.[FN43] He also claims that he was not permitted to shower or to have outside recreation for fourteen days.[FN44] Ford states that he complained of these deprivations to Sgts. Kimbler and Jewett on April 15, 2004, the day after his attack on Officer Miller and before some of the deprivations allegedly occurred, but that the Sargeants ignored his complaints.[FN45]

> **FN43.** *See e.g.* Complaint at 10.

> **FN44.** *Id.*

> **FN45.** *Id.* at 10-11.

### E. Ford's Mail Watch

Following his attack on Officer Miller, Shawangunk officials also implemented a mail watch for Ford pursuant to DOCS policy.[FN46] During the mail watch, DOCS employees discovered a letter from Ford in which he boasts about his attack on Officer Miller: "I had to let one of those crazy ass pink boys have a balance kit of steel & an hot oil treatment."[FN47] The mail watch also revealed a letter in which Ford apparently tried to convince his girlfriend and others to improperly influence a witness in his trial for that attack: "I'm trying to establish a way to try & beat this case, some way so (sic) how we have to make Mr. Hill do what we want him to do not what he wants to do."[FN48]

> **FN46.** Parasidis Decl., Ex. B, 126, 128-129, 131-137; Ex. J, FORD MAIL 1-12.

> **FN47.** *Id.,* Ex. E, FORD IG 316-324.

> **FN48.** *Id.,* at FORD IG 316, 325-333.

In his Complaint, Ford contends that Superintendent Joseph T. Smith authorized a mail watch on his personal and legal mail, which prevented Ford's girlfriend from receiving Ford's mail and prevented Ford from receiving mail from his girlfriend.[FN49] Ford further claims that DOCS employees and others conspired to deprive him of his privacy and to hamper his access to the courts by confiscating his incoming and outgoing legal mail, stating that incoming legal documents were taken and never returned to him.[FN50]

> **FN49.** Compl. at 13-14.

> **FN50.** *Id.* at 15.

> *DISCUSSION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

A. Legal Standard

**\*4** Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 55(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Gallo v. Prudential Residential Srvcs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and of identifying the matter that "it believes demonstrates the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

When, as here, both parties seek summary judgment, the Court must consider each party's motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Board of Educ.,* 667 F.2d 305, 314 (2d Cir.1981); *accord Abrams v. United States,* 797 F.2d 100, 103 (2d Cir.1986). However, the submissions of a *pro se* plaintiff are held to a less stringent standard than those drafted by an attorney and must be liberally construed for the benefit of the plaintiff. *Estelle v. Gamble,* 429 U.S. 97 (1976); *Patrick v. LeFevre,* 745 F.2d 153, 160 (2d Cir.1984).

B. Analysis

1. Eleventh Amendment

As a preliminary matter, defendants note that they are sued for damages in their official as well as individual capacities and argue that Ford may only sue defendants for damages in their individual capacities. Defendants are correct. *See Al- Jundi v. Estate of Rockefeller,* 885 F.2d

1060, 1065 (2d Cir.1989) ("[S]ection 1983 claim for damages against a state official can only be asserted against that official in his or her individual capacity"); *accord Davis v. New York,* 316 F.3d 93 (2d Cir.2002); *see also Kentucky v. Graham,* 473 U.S. 159 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the state and is therefore barred by the Eleventh Amendment); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1984) (agencies and departments of the state are entitled to assert the state's Eleventh Amendment immunity); *Santiago v. New York State Dep't of Corr. Servs.,* 945 F.2d 25, 28 n. 1 (2d Cir.1991) (department that is an agency of the state is entitled to assert Eleventh Amendment immunity); *cf. Hafer v. Melo,* 502 U.S. 21, 27-31 (1991) (Eleventh Amendment does not bar actions for damages against state officials sued in their personal or individual capacities). Accordingly, Ford's claims for damages against defendants in their official capacities are dismissed.

2. Excessive Force

**\*5** Regarding his claims for excessive force, Ford describes three instances of abuse in his Complaint, which he alleges occurred: (1) on the morning of April 14, 2004; (2) after his assault on Officer Miller; and (3) during his transfer to Special Housing. Defendants argue that Ford was not the victim of excessive force and that any force used against him was appropriate given his attack on Officer Miller and his combative behavior following that attack.

To prevail on a claim for excessive force constituting cruel and unusual punishment under the Eighth Amendment, a plaintiff must show the unnecessary and wanton infliction of pain. *Hudson v. McMillian et al.,* 503 U.S. 1 (1992) (citing *Whitley v. Albers,* 475 U.S. 312 (1986)). Whether an infliction of pain is unnecessary and wanton depends on the context in which force is used. *Whitley,* 475 U.S. at 320. Where prison officials use force to quell a prison disturbance, the question is whether force was applied in a good faith effort to maintain or restore discipline or, instead, if it was applied maliciously and sadistically for the purpose of causing harm. *Id.* at 320-21; *Hudson,* 503 U.S. at 7 (prison officials must act quickly when responding to a prison disturbance, balancing the need to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

"maintain and restore discipline" against "the risk of injury to inmates."). When an individual attacks with a deadly weapon, for instance, corrections officers may respond with commensurate force. *Diggs v. New York Police Dep't et al.,* 2005 U.S. Dist. LEXIS 38244, *1 (E.D.N.Y.2005) (citing *Tennessee v. Garner,* 471 U.S. 1, 11-12 (1985) and *Estate of Kenneth Jackson v. Rochester,* 705 F.Supp. 779, 783 (W.D.N.Y.1989)).

a. The Morning of April 14, 2004

Ford alleges that Officers Miller, Erns and McClenning, without provocation, kicked and punched him in the face, head, chest and back, while using racial epithets, on the morning of April 14, 2004. Defendants respond that Ford was abusive and disruptive on the morning of April 14, 2004 and that corrections officers "verbally counseled" Ford without using any force.[FN51]

FN51. *See e.g.* Parasidis Decl., Ex. E., FORD IG 303.

Having reviewed the parties' submissions and the evidence presented to the Court, we hold that no reasonable jury could find in favor of Ford on this claim. First, Ford's evidence is very weak and primarily suggests only a *de minimus* use of force. Ford offers no direct medical evidence supporting his claim[FN52] and his documentary evidence is limited to affidavits from other inmates, which contradict one another and are otherwise problematic.[FN53] The only affidavit submitted by Ford that offers any specific allegations of potentially excessive force is signed by inmate Eric Tolliver. That affidavit states, somewhat ambiguously, that Tolliver saw Officers Miller and McClenning attack Ford with "solid fist and kicks" after 9:40 a.m. on April 14, 2004.[FN54] However, in addition to being ambiguous in its description of the morning's events, Tolliver's affidavit suffers from the following problems: (1) it contradicts statements in the other affidavits submitted by Ford, including inmate Shaun Harris's sworn recollection of what Ford told Harris about that morning; (2) it makes no mention of Officer Erns, in contrast to the version of the events offered in Ford's Complaint; and (3) it was signed and dated by Tolliver on September 12, 2006, more than two years after the incident allegedly took

place.

FN52. Ford could have sustained any and all of the medical injuries evidenced in the record during his attack on Officer Miller or during his transfer to Special Housing.

FN53. Specifically: the May 19, 2004 affidavit of Shaun Harris offers no personal knowledge of the alleged attack, stating only that Ford told Harris that Officer Miller had pushed Ford into his cell after yelling at Ford; the July 22, 2004 affidavit of Jermaine Page offers personal knowledge of Ford being "up on the wall" on April 14, 2004, but says nothing about a push or any other violence; the September 14, 2004 affidavit of Jesse Guess states that Mr. Guess saw Officer Miller push Ford into his cell, consistent with what Harris claims Ford told Harris, but inconsistent with Jermaine Page's statement; the April 28, 2004 affidavit of Ralph Nieves only alleges general harassment of Ford by Officer Miller; and the August 24, 2004 affidavit of Allen Griffin generally alleges that he saw Officer Miller "verbally, mentally, emotionally, and physically" assault Ford on April 14, 2004, but does not specify whether the assault occurred in the morning or in the afternoon on April 14 and does not specify what kind of physical assault took place. The Court found these affidavits amidst a stack of disorganized papers in the case file kept by the clerk's office.

FN54. Paragraph 8 of the Tolliver affidavit states exactly as follows: "On April 14, 2004 I was out of my cell as usual to clean up after keeplock recreation went out approx. 9:30 AM, I was talking to the dubble (sic) bunk cell above 143, 4 company, for about 10 minutes, The cell on 4-company 143 opened up around 9:40 AM I locked in and called the guy whom I heard his name was "C" which I found out was actually Corey Ford, I told him to watch himself I seen C.O. Miller use the exact tactics that I warned [him] about yesterday, the Guy Corey Ford was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

called over to the [B] post first and the gate to 4-company was then locked, I seen solid fist and kicks being thrown by officer M. Miller and c.o. McClenning connecting against the inmate Corey ford FACE and body, The inmate was yelling for help, I witness the whole excessive force incident."

*6 Second, defendants offer evidence that Ford faced no excessive force on the morning of April 14, 2004, having submitted a number of sworn affidavits to this effect,[FN55] and Ford's own statements, made shortly after the alleged abuse, confirm this position. In a statement signed on April 14, 2004, and in another statement signed on April 15, 2004 ("Ford's Post-Incident Statements"), Ford does not accuse Officers Miller, McClenning and Erns of punching and kicking him during the morning of April 14, 2004. On the contrary, Ford makes no mention of any force used by Officers McClenning and Erns and only alleges that Officer Miller used a *deminimus* amount of force against him: "At this point, Miller slapped me on each side of my face ..."[FN56] *Candelaria v. Coughlin,* 787 F .Supp. 368, 374 (S.D.N.Y.1992) (use of force *deminimus* when officer "pushed his fist against [plaintiff's] neck so that [he] couldn't move and was losing [his] breath"), *aff'd* 979 F.2d 845 (2d Cir.1992).

FN55. *See supra* note 51.

FN56. Parasidis Decl., Ex. E, FORD IG 26-28 (quoting Ford's April 14, 2004 statement); *see also id.* at FORD IG 290-93 ("This is where he yells at me and slap me (sic) across my face"), dated April 15, 2004 at 9:00 a.m.

Third, given the different versions of the April 14 events offered by Ford and the inconsistencies between the affidavits submitted by Ford to support his Complaint, no reasonable jury could credit Ford's latest allegations. *See e.g. Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (plaintiff may not "create a material issue of fact by submitting ... affidavit[s] disputing his own prior sworn testimony" in order to defeat defendants' summary judgment motion) (quoting *Mack v. United States,* 814 F.2d 120, 124

(1987)); *Jeffreys v. City of New York,* 426 F.3d 549, 553 (affirming district court's grant of summary judgment for defendants in section 1983 case brought by *prose* prisoner-where plaintiff relied almost exclusively on his own testimony, district court could make assessments about whether a reasonable jury could credit plaintiff's testimony); *Shabazz v. Pico,* 994 F.Supp. 460, 470 (S .D.N.Y.1998) (Sotomayor, J.) (granting summary judgment for defendants where "plaintiffs allegations of the events at issue [were] replete with inconsistent and contradictory statements" and "plaintiff's version of the events ... [had] undergone at least one significant revision"). Ford has offered no fewer than four versions of what happened on the morning of April 14, 2004 through his submissions to the Court, at least three of which allege only a *deminimus* use of force and many of which, as discussed, are inconsistent with one another.[FN57] Moreover, Ford's signed and personal version of the events, without any explanation from Ford, has undergone at least one significant and self-serving revision, changing from a story about a *deminimus* use of force to one about a brutal, unprovoked beating.

FN57. *See supra* note 53. Versions of the events offered in Ford's submissions include: (1) Ford was pushed into his cell; (2) Ford was held up on a wall; (3) Ford was slapped in the face by Officer Miller; (4) Ford was punched and kicked by Officers Miller, McClenning and Erns; and (5) Ford was punched and kicked by Officers Miller and McClenning.

In sum, given the sheer lack of evidence to support Ford's new version of the April 14 morning events, the substantial evidence against that version, and the fact that Ford's initial, signed statements contradict the allegations in his Complaint and confirm defendants' position, no reasonable jury could find in favor of Ford on this claim. Accordingly, we deny Ford's motion for summary judgment and grant summary judgment in favor of defendants.

b. Attack on Officer Miller

*7 Regarding the afternoon of April 14, 2004, Ford

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

alleges that Officers Miller, Erns, Middleton and Phillips kicked and punched him, and that Sgt. Carey watched this happen without taking action. Having reviewed the parties' submissions, we hold that, even accepting Ford's allegations as true, no reasonable jury could find that defendants responded with excessive force when attempting to save Officer Miller.

The genesis of Ford's claim is his own brutal attack on Officer Miller. As Ford admits, he rushed Officer Miller, threw hot oil on his face and then stabbed him repeatedly with a nine inch shank. Given this use of potentially lethal force, and given that defendants had to react quickly to save Officer Miller, defendants were legally authorized to respond to Ford with significant force of their own, perhaps including deadly force. *See.e.g. Tennessee,* 471 U.S. at 11-12;*seealsoDiggs v. New York Police Dep't et al.,* 2005 U.S. Dist. LEXIS 38244, *1 (E.D.N.Y.2005). Most significantly, Ford does not allege that defendants used force even commensurate with the force that he used against Officer Miller. Instead, he only alleges that the officers punched and kicked him as they got him under control.[FN58] No reasonable jury could deem this force to have been wanton, unnecessary or otherwise excessive under the circumstances. Accordingly, we deny summary judgment for Ford and grant it for defendants.[FN59]

FN58.*Seee.g.* Parasidis Decl., Ex. B, FORD 1-2, 22, 43.

FN59. Additionally, the officers are protected by the doctrine of qualified immunity for this allegation of excessive force as it would be objectively reasonable to respond to Ford's apparent attempt to seriously injure or kill Officer Miller with force much greater than that alleged by Ford. *Seee.g.Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) (officers entitled to qualified immunity as it was objectively reasonable for them to believe that their actions were lawful at the time of the challenged act).

c. Transfer to Special Housing

Regarding his transfer to Special Housing, immediately following his attack on Officer Miller, Ford alleges that he was kicked and punched by the officers escorting him, that Sgt. Myers punched him in the right side of his face, that the officers tried to break his wrist while he was on the elevator to Special Housing, that the officers repeatedly rammed his head into the steel bars at the entrance to Special Housing, and that the officers rammed his head into the wall of the strip/frisk room.[FN60] Defendants respond that they did not use excessive force against Ford and that Ford was uncooperative and violent throughout the transfer to Special Housing.

FN60. Compl. at 9.

We deny Ford's motion for summary judgment on this claim. Ford offers no meaningful evidence, other than his own version of the events, to support the putative attacks during his transfer to Special Housing, and the medical evidence submitted by defendants tends to contradict Ford's claims. For instance, Ford asserts that his face and head were repeatedly rammed into steel bars, that the officers tried to break his wrist, and that Ford was otherwise beaten severely throughout the transfer-beatings that ostensibly followed Ford's alleged beating that morning at the hands of Officers Miller, Erns and McClenning as well as Ford's alleged beating during his attack on Officer Miller. Yet, the medical record of Ford's injuries upon his entrance to Special Housing reveals only the minor abrasions and scratches discussed *supra,* and the subsequent CAT-scan and x-rays revealed no injuries to Ford's abdomen or wrist. Moreover, Ford's transfer to Special Housing came immediately after, and because of, his assault on Officer Miller, making it objectively reasonable for the officers to use some amount of force to keep him under control.

**\*8** Despite the apparent weakness of Ford's evidence regarding this claim, we also deny defendants' motion for summary judgment. Defendants offer the medical evidence, which tends to contradict Ford's story, their sworn affidavits that Ford was not beaten during the transfer, their claims that Ford was combative throughout the transfer, and a video tape of the transfer that shows no violence being committed against Ford (but also does not show Ford being noticeably combative). Nevertheless, this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

evidence is not sufficient to preclude a reasonable jury from finding in Ford's favor. First, Ford offers his own sworn statement of the events in his Complaint, which describes a malicious, unprovoked beating accomplished while using racial epithets and, unlike his version of the morning attack, this version is consistent with Ford's Post-Incident Statements.[FN61]

> **FN61.** Ford makes no mention of abuse during his transfer to Special Housing in his April 14, 2004 statement. However, in his April 15, 2004 statement, Ford notes, "I also want to tell you about how I was assaulted in the elevator on my way to SHU. I was slammed in to the wall and taken to the floor a number of times. I did not resist. They had my hands cuffed behind my back and my pants were falling down. I had a hard time standing up-so I fell to the floor. When this happened they punched me in the balls. I think I got the bump on my head when they threw me into the wall....".

Second, although the Court might find the low level of injuries in Ford's medical reports to strongly contradict Ford's claims, we cannot rely on that evidence alone to enter summary judgment against him. *See e.g. Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (genuine issues of material fact existed concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him; district court mistakenly concluded that because appellant's injuries were not severe, appellant's claim failed as a matter of law); *Estelle,* 429 U.S. at 102-105 ("inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials").[FN62]

> **FN62.** As well, the evidence that Ford had blood in his urine tends to support his allegation that he was punched and kicked in the back. If defendants needlessly punched Ford in the back causing him to have internal bleeding, they violated his Eighth Amendment rights.

Finally, although the video tape shows Ford being escorted to and from the elevator to Special Housing and shows him entering the strip/frisk room and being stripped and frisked without apparent incident, the video has periodic breaks and interruptions. Whereas a complete video might dispel all issues of fact regarding Ford's transfer, an incomplete video cannot.[FN63] Accordingly, summary judgment is denied for defendants as well as for Ford on this claim.[FN64]

> **FN63.** Ford insists that defendants intentionally beat him when the cameras were off and during transitions between cameras. *See* Ford's Motion for Partial Summary Judgment at 8.

> **FN64.** Defendants claim that they are entitled to qualified immunity on all claims raised by Ford. However, the doctrine of qualified immunity, which protects officers in the reasonable exercise of their duties, clearly would not cover a malicious beating as alleged by Ford during his transfer to Special Housing. *See supra* note 59.

**d. Due Process**

Liberally construed, Ford's Complaint also alleges that the aforementioned uses of excessive force violated his due process rights under the Fourteenth Amendment. For prisoners, however, the Eighth Amendment "serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified." *Whitley v. Albers,* 475 U.S. 312, 327 (1986). "Any protection that 'substantive due process' affords convicted prisoners against excessive force is, [the Supreme Court] has held, at best redundant of that provided by the Eighth Amendment." *Graham v. Connor,* 490 U.S. 386, 395 (1989). Accordingly, Ford is only entitled to pursue his claims for excessive force under the Eighth Amendment. *Cf. Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995) (in the non-prisoner, non-seizure context, the due process right to be free from excessive force is alive and well). Thus, we grant summary judgment for defendants on this claim.

**3. Deprivations**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

**\*9** Ford also alleges that he suffered a number of deprivations upon being transferred to Special Housing and that these deprivations amounted to cruel and unusual punishment under the Eighth Amendment and to a violation of his due process rights under the Fourteenth Amendment. Defendants argue that Ford has failed to offer sufficient support for these claims.

a. Cruel and Unusual Punishment

"The constitutional prohibition against cruel and unusual punishments is intended to protect inmates from serious deprivations of basic human needs such as adequate food, clothing, shelter and medical care." *Malsh v. Garcia,* 971 F.Supp. 131, 138 (S.D.N.Y.1997). An Eighth Amendment claim challenging prison deprivations requires proof of subjective and objective components. Subjectively, the prison officials must have acted with deliberate indifference toward an inmate's health or safety and, objectively, the inmate's deprivation must have been sufficiently serious to have denied that inmate "the minimal civilized measure of life's necessities." *Branham v. Meachum,* 77 F.3d 626 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98 (1997) and *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert.denied* 513 U.S. 1154 (1995)). The "minimal civilized measures of life's necessities" is not a low standard. Indeed, "conditions that are restrictive and even harsh are part of the penalty that criminal offenders pay for their offenses against society." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (internal quotations omitted).

To support his Eighth Amendment claim, Ford alleges a number of deprivations. He complains that, on April 5, 12, 13, and 14, he was denied special meals, outside exercise and showers by Officer Miller and that, upon his arrival at Special Housing and until April 28, he was forced to have a plexi-glass shield on his cell, was denied recreation, was denied showers, did not trust the food given to him on one or two occasions, and was denied various personal items.

Defendants respond that Special Housing prisoners are limited in the number of belongings they may possess, that they are further limited in their recreation and shower privileges, and that these limitations may be extended if

members of DOCS staff determine that the inmate poses a threat to himself or to others. [FN65] Defendants further state that Ford's vicious attack on Officer Miller precipitated his placement in Special Housing, that DOCS staff placed the restrictions on Ford expressly in response to that attack, and in response to the danger that Ford posed to himself and to others, and that the restrictions, which were temporary in nature and made in accordance with DOCS policy, did not amount to a constitutional violation.

[FN65.] See Defendants' Mem. of Law at 10-13.

We agree with defendants that Ford's deprivation claims do not begin to demonstrate deliberate indifference toward Ford's need for the minimal necessities of life. Ford does not allege or explain why the temporary placement of a plexi-glass shield threatens his minimum needs and, as a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth Amendment. *See e.g. Chapple v. Coughlin,* 1996 U.S. Dist. LEXIS 12960, \*1 (S.D.N.Y 1996) (temporary deprivations of shower, recreation and legal papers "in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment") (citing *Majid v. Scully,* No. 83 Civ. 7409, 1985 WL 1408 \*6 (S.D.N.Y. May 21, 1985) (unpublished)); *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (prisoners must receive nutritiously adequate food that does not endanger their health and safety); *Cruz v. Jackson,* 1997 U.S. Dist. LEXIS 1093 (S.D.N.Y. Feb. 5, 1997) (two weeks without showers, cold food for four weeks and unspecified incidents of receiving rusty drinking water did not violate Eighth Amendment rights) (citing *Williams v. Greifinger,* 918 F.Supp. 91, 95 n. 3 (S.D.N.Y.1996)).

**\*10** Moreover, defendants have provided evidence that the deprivations were not a result of malice or of deliberate indifference to Ford's health or safety but, instead, served legitimate security and safety needs following Ford's attack on Officer Miller and were imposed during a period of time when Ford received food and medical care. [FN66] Accordingly, Ford's motion for summary judgment on his Eighth Amendment claim is denied and summary judgment is granted for defendants.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN66.*See.g.* Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57; Ex. I, FORD ORDERS 1-8.

b. Due Process

Ford also suggests that his confinement to Special Housing, given the deprivations discussed above, violated his right to due process under the Fourteenth Amendment. We construe Ford's Complaint as asserting his liberty interest to be free from confinement involving atypical and significant hardships without due process of law.

A prisoner's confinement to Special Housing in a New York prison may implicate that prisoner's legally recognized interest in being free from restraints imposing atypical and significant hardships relative to the ordinary incidents of prison life. *Sandin v. Connor,* 515 U.S. 472 (1995) (thirty days in Special Housing does not, by itself, violate prisoner's due process rights); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (prisoner failed to demonstrate significant deprivation of a liberty interest where he spent approximately twelve days in Special Housing and was denied "certain privileges that prisoners in the general population enjoy"); *Lee v. Coughlin,* 26 F.Supp.2d 615 (S.D.N.Y.1996) (Sotomayor, J.) (376 days in Special Housing implicated liberty interest recognized by the State of New York). However, to prevail under section 1983, a plaintiff must allege not only that his confinement to Special Housing implicated a recognized liberty interest, but also that the liberty interest was infringed without due process of law. *See.g.Cespedes v. Coughlin,* 956 F .Supp. 454, 469 (S.D.N.Y.1997).

Regarding Ford's claim that he was denied recreation, showers, and a special meal on four occasions before and on April 14, 2004, we deny summary judgment for Ford and grant it in favor of defendants. These minor and temporary denials clearly do not constitute significant hardships implicating a constitutionally protected liberty interest. *See.g.Frazier,* 81 F.3d at 317. We also deny summary judgment for Ford and grant it for defendants on Ford's claim arising from his confinement in Special

Housing.

There are three significant problems with Ford's due process claim based on his confinement in Special Housing. First, it is far from clear that the alleged confinement, even if accurately depicted by Ford, implicates a protected liberty interest given the temporary nature of the deprivations. *See.g.Frazier,* 81 F.3d at 317. Second, Ford has failed to allege that he was denied due process of law in connection with this ostensible liberty interest. Ford does not allege that he was denied a hearing or that his hearing officer was not objective, and he does not allege that defendants did not explain to him why he faced the deprivations he did. *Cf.Sandin,* 515 U.S. at 487-88 (summary judgment granted for defendants where plaintiff claimed violation of due process because defendants "refus[ed] to allow him to present witnesses at his hearing, and [sentenced] him to disciplinary segregation for thirty days.").

**\*11** Third, although Ford does allege that defendants deprived him of privileges and Special Housing property in violation of DOCS directive 4933, this allegation fails to state a violation of due process. For one, the text of Directive 4933 shows that Ford was not necessarily entitled to the claimed property and privileges under the circumstances of his confinement: "An order depriving an inmate of a specific item, privilege or service may be issued when it is determined that a threat to the safety or security of staff, inmates, or State property exists". Moreover, defendants offer a mass of evidence demonstrating that they followed Directive 4933 with respect to Ford and that Ford received full consideration and a hearing in connection with Directive 4933. A "Deprivation Order", dated April 14, 2004 and authorized by Sgt. Maly, for example, states:

In accordance with 7 NYCRR Section 305.2, you are being deprived of the following specific item(s), privilege(s), or service(s): All out of cell activities (including showers) because it is determined that a threat to the safety or security of staff, inmates or State property exists and for the following specific reason(s): You seriously assaulted a corrections officer. FN67

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN67. Parasidis Decl., Ex E., FORD GRIEVANCE 50. *See also id.* at FORD GRIEVANCE 50-58, 109, 118-20, 126, 128, 129, 131, 132, 133, 134, 135-37, 143; Ex. I, FORD ORDERS 1-8.

A lengthy statement reviewing Ford's April 19, 2004 grievance regarding his Special Housing confinement further provides: "Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby denied with clarification to the extent that the matter was investigated and the issue of the complaint has been found to be without merit." [FN68]

FN68. *Id.* at FORD GRIEVANCE 30.

Since Ford has failed to allege any cognizable violation of due process of law relating to his Special Housing confinement, and since defendants have provided the Court with ample, uncontroverted evidence that Ford received such process, summary judgment is denied for Ford and granted for defendants on this claim. [FN69]

FN69. We note further that the reasons and bases for Ford's confinement and deprivations in Special Housing should have been obvious to Ford immediately upon his transfer to Special Housing given that they arose immediately after his vicious attack on Officer Miller. Not only would such an attack make guards fearful for themselves and other prisoners should Ford be taken out of his Special Housing cell, but guards would also be fearful that Ford would use any property he obtained to hurt himself or others. In fact, this is the explanation provided in the deprivation orders and related documents submitted by defendants. *See supra* note 67.

4. Deliberate Indifference to a Serious Medical Need

Ford argues that defendants Joseph Smith, John Maly, Sgt. Kimbler and Dr. Bhavsar violated his constitutional rights by failing to provide adequate medical care for the injuries to his face, head, back, kidneys, groin area and penis during April of 2004. Defendants respond that Ford's pleadings are not sufficient to support a claim for constitutionally deficient medical care.

To maintain a claim for deliberate medical indifference, Ford must prove "deliberate indifference to [his] serious medical needs." *Hathaway,* 37 F.3d at 63 (quoting *Estelle,* 429 U.S. at 102 (medical indifference claim brought by prisoner pursuant to section 1983 alleging violation of Eighth Amendment as applied to the states via Fourteenth Amendment)). This standard requires proof of objective and subjective prongs. *Id.*

The objective prong of the deliberate indifference standard requires proof of a medical deprivation "sufficiently serious" to create a condition of urgency that might produce death, degeneration or extreme pain. *Id.; see e.g. Williams v. Vincent,* 508 F.2d 541 (2d Cir.1974) (easier and less efficacious treatment of throwing away prisoner's ear and stitching the stump may be deliberate indifference); *cf. Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (cut finger with "skin ripped off" is insufficiently serious); *Bonner v. N.Y. City Police Dep't,* No. 99 Civ. 3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (inability to close hand due to swelling insufficiently serious to constitute Eighth Amendment violation); *Gomez v. Zwillinger,* 1998 U.S. Dist. LEXIS 17713 at *16 (S.D.N.Y. November 6, 1998) (back pain and discomfort not sufficiently serious); *Jones v. New York City Health & Hosp. Corp.,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (S.D.N.Y. November 28, 1984) (deliberate indifference claim dismissed where plaintiff challenged treatment for bruises on head and body).

*12 The subjective prong of the deliberate indifference standard requires proof that the accused defendant knew of and disregarded "an excessive risk to inmate health or safety". *Hathaway,* 37 F .3d at 66 ("The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference."). Specifically, the plaintiff must prove that the accused defendant acted, or declined to act, with a state of mind equivalent to criminal recklessness. *See Boomer v. Lanigan,* 2002 WL 31413804,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

*1 (S.D.N.Y.2002) (Cote, J.) (unreported) (citing *Hathaway,* 99 F.3d at 553); *Cunningham v. City of New York,* 2006 U.S. Dist. LEXIS 35607 at *6 (S.D.N.Y. June 1, 2006) (mere disagreement between treating physician and patient about course of treatment does not give rise to a constitutional claim).

Having reviewed the pleadings and evidence submitted with the motions for summary judgment, we agree with defendants that Ford cannot prevail on his claim for deliberate medical indifference stemming from his treatment during April and May of 2004. First, most of the injuries asserted by Ford were not sufficiently serious to satisfy the objective prong of the deliberate indifference standard. Ford claims, and the prison's medical reports confirm, that Ford suffered from a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back when he was admitted to Special Housing. Abrasions, a minor bruise, slight bleeding and scratches are not injuries that may produce death, degeneration or extreme pain, and no reasonable jury could find to the contrary. *See e.g. Jones,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (allegations of bruises about head and body do not shock the conscience and are inadequate to state claim for deliberate medical indifference in section 1983 suit). FN70

FN70. The remaining injuries claimed by Ford, which might have appeared to be serious upon his initial complaints, also proved not to be serious. Ford complained that he found blood in his urine, that he vomited blood, that he suffered from persistent abdominal and groin pain, that his wrists hurt and that he had headaches and dizzy spells. Within a few weeks, however, Ford ceased to have blood in his urine; his bruises and abrasions were healed or healing normally; x-rays showed no damage to his wrist; and a CAT-scan revealed no injuries to the organs inside his abdomen or to his abdomen generally, confirming Dr. Bhavsar's finding that Ford had no tenderness in his ribs or abdomen. As well, Ford has not alleged that his vomiting, dizzy spells or headaches, for which there is no objective evidence to begin with, persisted or led

to more serious problems, and though Ford claims that he now has a weak bladder, he has not alleged that it is degenerative or causes him extreme pain. *See generally* Parasidis Decl., Ex. G, Bhavsar Decl.

Second, in light of the evidence submitted by defendants, Ford also cannot satisfy the subjective prong of the deliberate indifference standard. Various medical forms submitted by defendants reveal that Ford was evaluated on no fewer than eight occasions between April 14, 2004 and early May of 2004, including examinations by a triage nurse and visits with Dr. Bhavsar, and not including the regular opportunities Ford had to speak with a Special Housing nurse. As Ford admits, Dr. Bhavsar, in addition to examining Ford personally, ordered three different urine analyses, a set of x-rays, and a CAT-scan, calling for the latter two procedures even though Ford's wrist and abdomen showed no apparent signs of problems. Dr. Bhavsar's records further reveal that he explained to Ford the proper course of treatment for his various injuries, that he prescribed Tylenol for his minor injuries, and that he continued to monitor Ford's possible internal injuries, such as the blood in his urine, until those symptoms subsided. FN71

FN71. *Id.*

*13 As such, no reasonable jury could find that the medical staff demonstrated deliberate indifference to Ford's medical condition and certainly Ford has not offered any evidence to suggest that the medical care he received amounted to criminal recklessness. On the contrary, a reasonable jury would readily find that Ford, in receiving x-rays for a non-swollen wrist with full movement, a CAT-scan for an abdomen showing no tenderness, and three urine tests for a problem that shortly resolved itself, obtained more thorough medical attention while incarcerated than he would have outside of prison. For these reasons, we deny Ford's motion for summary judgment and grant defendants' motion for summary judgment on Ford's medical indifference claim. FN72

FN72. Even if one or more officers ignored Ford's complaints on one or more specific

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

occasions, which Ford alleges without offering additional support, the fact that Ford actually received extensive and repeated medical attention demonstrates that those instances of indifference did not deny Ford adequate medical attention. Moreover, to prevail on the subjective element against those officers, Ford would have to demonstrate that the officers knew that Ford actually had a serious injury-as opposed to simply hearing Ford complain of such an injury-and nevertheless ignored it. Ford has not offered any evidence to this effect, beyond that he complained more than once that he suffered from severe pain. He does not, for instance, allege that the officers saw him bleeding or otherwise suffering some clearly serious injury.

5. Mail Interference

Ford further complains that the DOCS staff instituted a mail-watch on his personal mail and confiscated some of his mail in violation of his constitutional rights, denying him access to the courts and preventing him from communicating with his girlfriend. Defendants admit that they instituted a mail watch on Ford following his attack on Officer Miller and argue that Ford has not sufficiently alleged any constitutional violation based on mail interference.

a. Denial of Access to the Courts

In order to state a constitutional claim for denial of access to the courts, a plaintiff must show deliberate and malicious action resulting in an actual injury, such as the dismissal of an otherwise meritorious claim. *Cancel v. Goord,* 2001 U.S. Dist. LEXIS 3440, *16 (S.D.N.Y. Mar. 29, 2001) (plaintiff must show frustration of non-frivolous claim as a result of official action) (citing *Washington v. Jones,* 782 F.2d 1134, 1138 (2d Cir.1986)); *see also Lewis v. Casey,* 518 U.S. 343, 351 (1996); *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997). Actions causing mere delay in a prisoner's ability to work on a legal action or to communicate with the courts do not rise to the level of a constitutional violation. *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,*

784 F.2d 149, 151-52 (2d Cir.1986)).

We agree with defendants that Ford cannot prevail on his denial of access claim. Ford's only allegations that defendants' interference with his mail caused him an actual legal injury are his vague statements that the interference made him lose papers that were "very important" to his motion to set aside the verdict in his criminal trial and that the interference hurt his preparation for sentencing.[FN73] Ford has not alleged that he missed any deadlines or faced any other, specific legal injuries as a result of the alleged interference, and the mere suggestion, without any supporting argument or evidence, that Ford would have succeeded on his motion to set aside the verdict or that he would have received a lighter sentence but-for defendants' mail-watch clearly does not state that Ford lost an otherwise meritorious claim.[FN74] This is especially true in light of Ford's conviction for the offense charged, the substantial evidence supporting that conviction discussed *supra,* the fact that Ford has not yet been sentenced for his attack on Officer Miller, and the fact that Ford, far from proceeding *prose,* has been represented by counsel throughout his criminal and post-trial proceedings.[FN75] Thus, we deny Ford's motion for summary judgment on this claim and grant summary judgment in favor of defendants.

FN73. *See* Ford Brief at 22-23; *see also* Complaint at 25.

FN74. Ford also generally alleges that he was denied the right to appear before a grand jury. However, Ford does not explain how interference with his mail caused this denial and he has also submitted documents to the Court suggesting that he did not intend to appear before the grand jury in his criminal case. *See infra* note 75 at 3-4.

FN75. *See* March 16, 2006 Order of Judge Hayes at 2-3 (Ford was initially represented by Assistant Public Defender James Hill and was later represented by Assistant Public Defenders George Hazel and David Martin. Kenneth J. Roden, Esq. represented Ford in connection with

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

his CPL §§ 330.30 and 440.10 motions).

**b. First Amendment**

**\*14** Ford's Complaint does not expressly assert a First Amendment claim based on interference with his non-legal mail, but a liberal reading of that document suggests that Ford intended to do so since he complains that DOCS staff took mail going to and coming from his girlfriend.[FN76] In order to state a First Amendment claim based on mail interference, a prisoner must show that the interference either did not further one or more substantial government interests, such as security, order and rehabilitation, or that the interference was greater than necessary to the protection of that interest. *Davis,* 2003 U.S.App. LEXIS 13030 at \*8-10 (citing *Washington v. James,* 782 F.2d 1134 (2d Cir.1986)); *U.S. v. Felipe et al.,* 148 F.3d 101 (2d Cir.1998) (interception of prison correspondence does not violate First Amendment if prison officials had "good or reasonable cause" for inspection) (citing *U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996) ("We think it clear that-at least where prison officials have reasonable cause for suspicion-surveillance of inmate mail is unobjectionable; investigation and prevention of illegal activity among inmates is "a legitimate penological interest, which has a logical connection to the decision to impose a mail watch on a prisoner").

> FN76. At times in Ford's submissions, he also complains of losing mail to his spouse. It is not entirely clear whether the spouse and girlfriend to whom Ford refers are the same person, but the pleadings, taken together, strongly suggest that this is the case.

We agree with defendants that no reasonable jury could find for Ford on his First Amendment claim. To the extent that Ford complains about a mail watch, it is evident from defense submissions and from the facts discussed *supra* that defendants had legitimate reasons for monitoring Ford's mail, namely: (1) to investigate Ford's assault on Officer Miller; (2) to prevent Ford from instigating further violence following that assault; and (3) to monitor efforts by Ford to improperly influence his trial for that assault.[FN77] In fact, the mail watch revealed one letter in

which Ford admits to stabbing and throwing hot oil on Officer Miller, which proved to be useful to the prison's investigation of that attack, and at least one letter wherein Ford discusses and recommends efforts to improperly influence a witness in his trial.[FN78]

> FN77.*See* Parasidis Decl., Ex. C, FORD GRIEVANCE 126, 128-29, 131-37; Ex. J, FORD MAIL 1-12; Ex. E, FORD IG 316-24.

> FN78.*Id.*

Moreover, although destroying Ford's incoming and outgoing mail would likely go beyond the measures necessary to protect the prison's interests in security and in investigating Ford's assault, Ford has failed to plead any instance of mail interference wherein defendants improperly confiscated his mail. Ford generally alleges that defendants took mail going to and from his girlfriend, but he does not allege any specific occurrence of confiscation and does not specify whether DOCS staff confiscated just the two letters discussed above or whether they took other letters as well. Clearly, if defendants only confiscated the letters admitting to the assault on Officer Miller and attempting to improperly influence Ford's trial for that assault, the confiscation did not go beyond what was necessary to protect the prison's legitimate penological interests. Without any specific allegation regarding some other confiscation by DOCS staff, without any evidence offered to support such an allegation, and given defendants' affidavits and documents stating that defendants merely implemented an appropriate mail watch in accordance with DOCS policies and procedures,[FN79] no reasonable jury could find that defendants violated Ford's constitutional rights by improperly interfering with his non-legal mail.

> FN79.*See.e.g.* Parasidis Decl., Ex C., FORD GRIEVANCE 128-29, 131-37; Ex. J, FORD MAIL 1-12.

**\*15** Accordingly, Ford has not sufficiently alleged any violation of his rights regarding the mail to state a constitutional claim. Ford's summary judgment motion for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

his mail claims is denied and summary judgment is granted in favor of defendants.

6. Responsibility of Individual Defendants

Defendants' Memorandum of Law concludes by arguing that Ford fails to allege that certain defendants were personally involved in or responsible for the constitutional violations he alleges, entitling those defendants to judgment as a matter of law. Specifically, defendants argue that Ford fails to allege: (1) that Sgt. Carey, Superintendent Phillips and Sgt. Guiney used any force against him; (2) that Inspector Vacca violated his constitutional rights by ordering a mail watch; and (3) that Sgt. Kimbler and Sgt. Jewett are responsible to him for any deliberate indifference to his medical needs. Defendants are correct that Ford must allege and support personal involvement in the constitutional violations to prevail against these defendants. *See e.g. Woods v. Goord,* 2002 U.S. Dist. LEXIS 7157, *23 (S.D.N.Y.2002) (Section 1983 plaintiff must allege personal involvement of each defendant); *see also Montero v. Travis,* 171 F.3d 757, 761-62 (2d Cir.1999) (requiring allegation of direct personal involvement against supervisory official to state section 1983 claim) (citing *Sealey v.. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)).

Having reviewed Ford's submissions, we agree that Sgt. Carey, Superintendent Phillips and Superintendent Guiney are entitled to summary judgment. Ford does not accuse these defendants of using excessive force against him. We also agree that Inspector Vacca is entitled to summary judgment given that we grant defendants' motion for summary judgment on Ford's mail interference claims, and that Sgts. Kimbler and Jewett are entitled to summary judgment on Ford's claims for medical indifference and for lack of due process.

*CONCLUSION*

For the reasons stated above, we deny all aspects of Ford's motion for summary judgment and grant summary judgment for defendants on all of Ford's claims except for his excessive force claim arising from his transfer to Special Housing on April 14, 2004 .[FN80] Thus, Ford may pursue his claim for excessive force against defendants C.O. Huttel, C.O. Austin, C.O. Czyzewski and Sgt. Myers,[FN81] but his Complaint is dismissed as to the following defendants: Superintendent Phillips, Deputy Superintendent Guiney, C .O. Miller, C.O. Middleton, C.O. McClenning, C.O. Erns, Sgt. Carey, Superintendent Smith, Deputy Superintendent Maly, Dr. Bhavsar, Sgt. Kimbler, Sgt. Jewett and Inspector General Vacca.

> FN80. Ford raises what purports to be an equal protection argument, for the first time, in his Motion for Partial Summary Judgment, dated July 24, 2006, at 26-27. The argument offers only minimal facts and conclusions of law, without providing any reason or argument as to why those facts support a violation of Ford's right to equal protection. To the extent that Ford seeks summary judgment on an equal protection claim, summary judgment is denied.

> FN81. Although we do not grant summary judgment for defendants on Ford's one remaining claim, we note that our reluctance to do so should *not* be taken to reflect any view that Ford will prevail on that claim. On the contrary, Ford has only limited evidence to support the claim and defendants have considerable evidence against it. Moreover, for the plaintiff's edification, even if a jury were to find in his favor on that claim, it would be entitled to award Ford only nominal damages-as low as $1-if it found that Ford deserved nothing more.

IT IS SO ORDERED.

S.D.N.Y.,2007.
Ford v. Phillips
Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.