UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**TERRY CICIO,**

                       **Plaintiff,**

                   **-v-**                         **9:08-CV-534 (NAM/DEP)**

**GRAHAM; PETER M. SIGONA; RICHARD
D. RUSTON, III; PHIL J. MANNA; A. VEGA;
and RYERSON,**

                       **Defendants.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

TERRY CICIO
01-R-5455
Upstate Correctional Facility
P.O. Box 2001
Malone, New York 12953
Plaintiff, *pro se*

HON. ANDREW M. CUOMO
Office of the Attorney General of the State of New York
ADRIENNE J. KERWIN, ESQ., Assistant Attorney General
Department of Law
The Capitol
Albany, New York 12224

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brought this action for declaratory and monetary relief under 42 U.S.C. § 1983, claiming excessive use of force, failure to intervene, and denial of adequate medical care stemming from a disturbance involving 17 or more inmates occurring in a "holding pen" or "cage" at Auburn Correctional Facility ("ACF") on March 7, 2006. Plaintiff moved for summary

judgment (Dkt. No. 35) and defendants cross-moved for summary judgment (Dkt. No. 38). Upon referral of the motions pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge David E. Peebles issued a Report and Recommendation (Dkt. No. 41) recommending that this Court deny plaintiff's motion, grant defendants' motion, and dismiss the action.

Plaintiff has submitted an objection (Dkt. No. 42). Plaintiff states that the Court should have reviewed the transcripts from his disciplinary hearing, because the testimony of defendants Peter M. Sigona and Richard D. Ruston, III at that hearing "contradicts the reports that [Magistrate Judge Peebles] relied on in making [his] decision." Plaintiff gives no specifics and thus appears to be interposing a general objection directed to the issues of excessive force and failure to intervene. His objection does not refer to the issue of medical indifference.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews *de novo* those parts of a report and recommendation to which a party specifically objects. Where, as here, a party interposes only general objections to a report and recommendation, the Court reviews for clear error or manifest injustice. *See Davis v. Chapple*, 2010 WL 145298, *2 (N.D.N.Y. Jan. 8, 2010), *Brown v. Peters*, 1997 WL 599355,*2-* 3 (N.D.N.Y.), *aff'd without op.*, 175 F.3d 1007 (2d Cir. 1999). Failure to object to any portion of a report and recommendation waives further judicial review of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993).

The Court accepts and adopts Magistrate Judge Peebles' Report and Recommendation. In view of plaintiff's objection, which, as noted, appears to be directed to the evidence on the issues of excessive force and failure to intervene, the Court briefly revisits these issues. Although plaintiff interposes only a general objection on these issues, in light of his *pro se* status and the

-2-

nature of the objection, the Court conducts a *de novo* review. Plaintiff requests the Court to obtain the transcript of the disciplinary hearing and contends that the testimony given by Sigona and Ruston at that hearing contradicts the reports relied on by Magistrate Judge Peebles; however, as explained below, the award of summary judgment to defendants is based on plaintiff's own evidence.

The record evidence pertinent to the excessive force and failure to intervene claims is briefly summarized as follows. In a declaration supporting the motion for summary judgment, Sigona, a sergeant at ACF, states:

> On March 7, 2006, I was supervising the hospital depot area at Auburn. While waiting with a group of inmates in the holding pen in the hospital depot, inmate Baer became disruptive and began threatening staff. Baer ignored several orders by me to cease his behavior. I then entered the holding pen with Officers Manna and Ruston with the intention of removing inmate Baer.
>
> All of the inmates in the pen were ordered to one side of the pen, while Baer remained on the other. Inmate Green refused to move, so I guided him to the side directed.
>
> While I was guiding inmate Green, plaintiff Cicio then lunged at Officer Manna, striking him with a closed fist and knocking him to the ground. I immediately went to Officer Manna's aid and assisted with gaining control of Cicio by taking control of Cicio's right side. Officer Manna and I then escorted a struggling Cicio out of the pen, after which Cicio and Officer Manna fell to the floor. Once Cicio stopped struggling, he was removed from the area and taken to medical for examination.

The declaration from defendant Philip J. Manna, a corrections officer at ACF, is consistent with Sigona's declaration.

Plaintiff's complaint states that defendant Sigona pushed plaintiff into defendant Manna "who then grabbed plaintiff by the hair and began to pull plaintiff towards [the] holding pen door at which point plaintiff was thrown to the floor and kneed in [the] nose." The complaint further

-3-

states that, after plaintiff was brought to his feet and escorted out of the immediate area, defendant Manna "once again grabbed plaintiff by his hair and pushed plaintiff's face into [the] wall." According to plaintiff, Sigona and Ruston "stood and watched the incident" and did not "intervene[] to stop the assault."

Plaintiff testified in his deposition that there were 17 or 18 inmates in the holding pen awaiting transport; that there were no corrections officers in the pen but there were some in the vicinity; that another inmate George Baer started "cursing up a storm" at a corrections officer; and that the sergeant told Baer to "cut it out," to which Baer responded, "No." The sergeant then said, "Take him out of there," ordered Baer to come up front, and ordered everyone else to the back of the pen. Instead of coming up front, Baer "sat down in the middle of the cage." Plaintiff stated that everyone else went to the back of the pen except plaintiff and inmate Green; according to plaintiff, they could not go back because "there was no more room." As plaintiff describes it:

> There wasn't any more room. And he [Green] was standing directly in front of Inmate Baer. So they started taking Green out of the holding pen, and that's where everything just a whole jumble of things happened. I ended up getting mixed up in that, because one of officers tried to barge in there and push me into the sergeant, and then I got into a use of force behind it. So a whole lot of events that took place after one move.
> ***
> Once they started pulling [Green] out [of the pen], other officers barged into the cage. I don't know if done purposely or not, but I was pushed into the sergeant, and from there I was given an assault charge and taken down.
> ***
> ...[Baer] was sitting there [in the middle of the pen] when Green was being taken out. After I was pushed to the sergeant, I don't know what happened.

Plaintiff's deposition testimony continued:

> Q. Was Green eventually taken out?
> A. Yes.
> Q. Okay. Now, was he still in the cage when you got pushed into the sergeant?

-4-

A. I am not sure.
Q. It was all happening at the same time?
A. Yes.
Q. Did you see any officers go to Baer to get him up and out?
A. Not specifically, because by this time it was just chaos in the cage. I was on the floor somewhere. I don't know where.
Q. How many officers were taking out Green?
A. When I first seen, I only saw one before everything just –
Q. When the sergeant said, "Take him of there," meaning Baer, how many officers entered the pen?
A. At the time, there was about five or six.
Q. They entered at the time just to remove Baer because of the goings on?
A. Yes.
Q. Was one of them the sergeant?
A. Yes. There was a sergeant in there.
Q. So the sergeant and/or three or four officers?
A. Quite a few, yes. Something like that.
Q. Okay. So they enter. Then Green is told to move. He doesn't. Somebody, was it one of those officers that entered that tried to remove Green?
A. The first officer that enters, the one that ... talked to him at first trying to remove him. I don't know which officer that was.
Q. Okay. But no additional officers to deal with Green, it was somebody in there from Baer?
A. Right. Once Green, once they saw an officer pulling Green out of the cage, that's when more officers entered the cage.
Q. So I think, and when I try to recap what you just said, I am not trying to put words in your mouth, but tell me if I am doing it wrong. I am trying to make sure I get it right. You said five or six officers came in to deal with Baer; is that right?
A. Something close to, right.
Q. How many more entered once Green became an issue?
A. I have no idea, because by that time I was into the sergeant and on the floor.
Q. Okay. All right. So somebody, as they are rushing in, whether intentional or not, you don't know, pushed you into the sergeant?
A. Right.
Q. Then what happened?
A. From there, I was taken down. I got kneed in the nose.
Q. Do you know who took you to the floor?
A. I am only going by the reports.
Q. Okay.
A. I don't know specifically. Only in the reports that they wrote do I know any names.

> Q. Okay.
> A. But other than that, at the time of the incident, I didn't know anything.
> Q. Okay. At what point in time did you -- at some point in time did you see the report?
> A. I saw the reports after I got my misbehavior report, and I got my assistance, and I asked for the use of force report, and the unusual incident report, and everything else.
> Q. Okay. Now, once you were taken to the floor, then what happened? Take me through it totally.
> A, Once I was taken to the floor, another CO kneed me in the nose. I don't know who.
> Q. You don't think it was the same person that took you to the floor?
> A. I doubt it.
> Q. All right. Okay.
> A. And once I was lifted, I was pulled [from] the cage by my hair. At the time I had a lot of hair. I was pulled out [of] the cage by my hair, and then I hit the floor again.
> Q. Okay. Now when you hit the floor again, were you taken to the floor? Do you know how that happened, the second hitting of the floor?
> A. I am not sure.
> Q. Okay.
> A. I am not sure.
> Q. You ended up on the floor?
> A. I just ended up on the floor with a couple C.O.s on top of me. I don't know if they fell, if I fell. I have no idea.
> Q. There were other officers on the floor with you?
> A. Right.

Plaintiff explained that he was then removed from the scene, taken upstairs to "their SHU" and given a ticket. He was placed in a different holding pen where a nurse came to see him within 15 or 20 minutes. According to plaintiff, he told the nurse that his nose hurt, he had pains in his right wrist, which was swollen, and some of his hair "had got pulled out in back." He was not bleeding. He requested and was denied pain medication, although at some later time he was given ibuprofen. He had headaches "off and on" for two or three weeks and his wrist was swollen for a few days, although it did not limit any of his activities.

When the disputed facts are viewed most favorably to plaintiff and considered in

combination with the undisputed facts, the record shows the following: a group of 17 or 18 inmates was confined in the pen; one inmate, Baer, became disruptive and refused to comply with Sergeant Sigona's direction to stop; five or six corrections officers entered the pen to remove Baer; the other inmates were directed to move to the back of the pen; there was not room for Green and plaintiff to do so; Green was told to move but did not do so; and corrections officers began removing Green. The evidence further shows that at that point "just a whole jumble of things happened"; more corrections officers entered the pen; as they were entering, one of them – intentionally or not – pushed plaintiff into Sergeant Sigona; it was "chaos" in the pen; a corrections officer took plaintiff to the floor; and plaintiff then "got kneed in the nose," probably by a different corrections officer. Plaintiff was then pulled out of the pen. In his complaint he states that Officer Manna again grabbed him by the hair and pushed his face into the wall, whereas in his deposition, plaintiff stated that he was pulled out of the pen by his hair and "ended up on the floor again" with a couple of corrections officers on top of him, and added: "I don't know if they fell, if I fell." He was then removed and taken to SHU, where a nurse examined him within 20 minutes.

The Court agrees with Magistrate Judge Peebles that defendants are entitled to summary judgment dismissing plaintiff's claims of excessive force. It is undisputed that the force used on plaintiff on March 7, 2006 occurred in the context of a disturbance involving 17 or 18 inmates in a holding pen. In plaintiff's own word, it was "chaos." Indeed, plaintiff states that when he was pushed into Sergeant Sindona it may have been unintentional, and that, when he went to the floor a second time, it may have been because he and/or the corrections officers fell. In view of this evidence and the minimal nature of plaintiff's injuries, no rational trier of fact could conclude that

plaintiff was subjected to force that was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. *See Wright v. Goord*, 554 F.3d 255, 268-69 (2d Cir. 2009). For the same reason, there is no basis for a claim of failure to intervene. Moreover, no rational trier of fact could find that plaintiff suffered a serious medical need. As to the other issues raised, the Court agrees with the Report and Recommendation. Accordingly, the Court hold that plaintiff has failed to establish that he is entitled to summary judgment; defendants have demonstrated their entitlement to summary judgment; and plaintiff has failed to show the existence of a material question of fact.

In addition to his objection to the Report and Recommendation (Dkt. No. 42), plaintiff has filed what appears to be an appeal from the Report and Recommendation (Dkt. No. 43). Because Magistrate Judge Peebles did not issue any order which could be the subject of the appeal, the appeal is denied. In the event that plaintiff wishes to appeal from this Memorandum-Decision and Order, he should follow the procedure set forth in the Civil Appeals Packet, which will be provided to him with this decision.

It is therefore

ORDERED that United States Magistrate Judge David E. Peebles's Report and Recommendation (Dkt. No. 41) is accepted and adopted; and it is further

ORDERED that the appeal (Dkt. No. 43) from the Report and Recommendation is denied; and it is further

ORDERED that plaintiff's motion for summary judgment (Dkt. No. 35) is denied; and it is further

ORDERED that defendants' cross motion for summary judgment (Dkt. No. 38) is granted

-8-

and the complaint dismissed on the merits; and it is further

    ORDERED that the Clerk is directed to provide plaintiff with a Civil Appeals Packet.

    IT IS SO ORDERED.

Date:  March 15, 2010
        Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge